## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF IOWA
## CENTRAL DIVISION

| | |
|---|---|
| JACK R. BADER, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>MIDLAND NATIONAL LIFE INSURANCE COMPANY<br><br>Defendant. | Civil Action No. 4:25-cv-00020-SHL-SBJ<br><br>July 2, 2025<br><br>CLASS ACTION |

## PLAINTIFF'S FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff Jack R. Bader ("Plaintiff" or "Bader"), individually and on behalf of all others similarly situated, for his First Amended Class Action Complaint against Defendant Midland National Life Insurance Company ("Midland")[1] states and alleges as follows:

## INTRODUCTION

1.       This is a class action on behalf of those who purchased from Defendant an Indexed Universal Life ("IUL") insurance policy (the "Policy" or "Policies"). Plaintiff brings this action to address Defendant's breaches of contract and their racketeering through the use and control of an enterprise of marketing entities that duped consumers by providing them with Defendant's materially misleading representations and omissions in connection with the sale of such Policies.

---

[1] Although Sammons Financial Gorup ("Sammons") was a Defendant in the original Complaint [Doc 1], Plaintiff has not pled a claim against Sammons in this First Amended Complaint pursuant to the terms of a stipulated Tolling Agreement entered between Plaintiff and Sammons (*see* [Doc. 37]).

2.     Each Policy charges an annual premium that is supposed to cover the cost of providing insurance benefits and accumulated insurance value. The Policy Account Value is the Net Premium (meaning the Premium minus the Premium Load, an amount charged each time a premium is paid) minus the Monthly Deduction (which includes cost of insurance, expenses, and the rider charge). The Policy Account Value is supposed to eventually grow large enough (and continue to increase in value) to cover the ongoing annual cost of insurance and provide the policyholder with the lifetime income benefit for which the Policy was purchased.

3.     The Policy Account Value is comprised of the Fixed Account Value and the Index Account Value. The Index Account Value consists of an Index Account to which Policy Account Value can be allocated using Index Segments. Index Segments are accounts that earn Index Credits based on the performance of an Index Selection. The Index Selections are comprised of notional assets that are used by Defendant to calculate the amount in Index Credits to be credited to the Policy Account Value. Defendant offered four different indices for this purpose; Plaintiff chose the Fidelity Multifactor Yield 5% ER Value ("Fidelity Index").

4.     However, as detailed below, the Fidelity Index that Defendant offered was not what was promised, thus breaching the Policies. For example, contrary to the Policy Terms, the Fidelity Index is an excess return index, meaning only the excess return above the Fed Funds Rate is the Index Credit for the Equity Component credited to the Fidelity Index Segment. The Policies also promised Index Selections with 20 years of historical performance when, in fact, the Fidelity Index was in existence for only a fraction of that time. The promised "historical" performance was, in fact, a sales trick. Defendant made these false representations and material omissions concerning the nature, returns and risk of these Index Selections. Defendant also provided misleading data with respect to the Fidelity Index Selection Index Crediting Method in

that the rates are based on a 0% Floor Rate and a Participation` Rate above 100%, creating hidden costs for Plaintiff and resulting in a further reduction in the returns credited under the Fidelity Index.

5.    Because of Defendant's wrongful conduct, Plaintiff and class members have and will continue to earn less money to cover future cost of insurance obligations, receive as income benefits, or withdraw in a cash surrender. Accordingly, Defendant have caused material harm to Plaintiff and the proposed class members.

## JURISDICTION AND VENUE

6.    This Court has original jurisdiction over the claims asserted herein individually and on behalf of the Class pursuant to 28 U.S.C. §1332, as amended in 2005 by the Class Action Fairness Act. Subject matter jurisdiction is proper because: (1) the amount in controversy in this class action exceeds five million dollars, exclusive of interest and costs; and (2) a substantial number of the members of the proposed class are citizens of a state different from that of Defendant. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, which provides for federal jurisdiction over civil actions arising under the laws of the United States, including RICO, and pursuant to 18 U.S.C. § 1964, providing for federal jurisdiction to prevent and restrain violations of 18 U.S.C. § 1962.

7.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial portion of the events giving rise to Plaintiff's causes of action occurred in this District in that it is the headquarters of Sammons, which is the parent company of Midland, and, upon information and belief, the substantive underwriting of the Policies occurred in this District.

## PARTIES

8.    Plaintiff Jack R. Bader is a resident of Vassar, Michigan.

9.    Defendant Midland is a South Dakota corporation with its administrative office in Sioux Falls, South Dakota and principal place of business in West Des Moines, Iowa. It is a wholly owned subsidiary of Sammons Financial Group, Inc., a Delaware corporation with its principal place of business in West Des Moines, Iowa.

## FACTUAL BACKGROUND

### A.  *The Sales Process*

10.    Defendant partners with independent marketing organizations ("IMOs") to market the Policies. IMOs recruit broker general agencies ("BGAs") who provide back-office support for independent agents. The independent agents, in turn, sell Policies to policyholders like Plaintiff. The IMOs, BGAs, and independent agents are non-Defendant RICO enterprise members, and are collectively referred to as "Sales Channel Persons" herein.

11.    In May 2023, Plaintiff opened communications with Defendant's agent concerning purchasing a life insurance policy.

12.    Plaintiff met with Defendant's agent on June 4, 2023. Plaintiff informed Defendant's agent that his goal was to put money away for retirement. The agent steered Plaintiff away from a 401k or an IRA and steered Plaintiff towards the Policy. Plaintiff met with Defendant's agent again on July 11, 2023, November 2, 2023. And November 29, 2023.

13.    After the November 29 meeting, Defendant's agent emailed Plaintiff a Universal Life Insurance Policy Basic Illustration. The agent sent a second illustration on December 4, 2023, and a third on December 15, 2023.

14.    On or about December 20, 2023, Defendant sent to Plaintiff at his home yet another Universal Life Insurance Policy Basic Illustration dated December 19, 2023 (the "Illustration"), along with a policy to e-sign.

15.     On or about January 10, 2024, Defendant sent to Plaintiff at his home a packet of documents entitled Policy Information. The packet included a Policy Summary, a Policy Delivery Requirement statement, a welcome letter, Policy "disclosure material" ("Disclosure Material,") a Life Insurance Buyer's Guide ("Buyer's Guide"), a Statement of Policy Cost and Benefit Information,  and a Flexible Premium Adjustable Universal Life Insurance Policy with Indexed Features (the 'Policy").

16.     At each step in the chain, Defendant strictly required the Sales Channel Persons to use the Policy and Illustration created and provided by Defendant and prohibited the Sales Channel Persons from creating their own marketing materials or illustrations relating to the Policies.

### B.  *The Policy*

17.     Policy number 1508167852 was issued to Plaintiff. The Policy is an indexed universal life ("IUL") insurance policy known as the Strategic Accumulator IUL 2.

18.     Plaintiff is the Owner of the Policy.

19.     The effective date of the Policy is January 10, 2024.

20.     The face or base coverage amount of the Policy is $1,162,893.

21.     Pursuant to the Policy, Plaintiff was required to pay and paid Planned Periodic Premiums.

22.     The Policy also has a Premium Load, which is an amount that may be charged each time a premium is paid up to a maximum of 7.5% of Premium paid.

23.     The Net Premium is the Premium paid minus the Premium Load.

24.     The Policy also has a Monthly Deduction, which includes the Monthly Cost of Insurance, the Expense Amount, and the Rider Charge for the Policy Month.

25.     The Policy Account Value is the Net Premium minus the Monthly Deduction.

26.     The Policy Account Value is comprised of the Fixed Account Value and the Index Account Value.

27.     The Fixed Account Value is the Fixed Account Value from the preceding month, plus any monthly Net Premium or allocations to the Fixed Account, minus the Monthly Deduction, minus any transfers or withdrawals from the Fixed Account, and any charges to the Fixed Account.

28.     The Fixed Account earns interest.

29.     The Policy also has an Index Account to which the Policy Account Value can be allocated.

30.     The Index Account is comprised of Index Segments.

31.     An Index Segment is an account that earns Index Credits based on the performance of an Index Selection.

32.     An Index Credit is the amount credited to the Index Segment.

33.     The Index Selections are the crediting options available for earning Index Credits under the Policy.

34.     The Index Crediting Method is the method the policyholder selects to calculate the Index Selection growth.

35.     The Index Segment value is the Index Segment value from the preceding month, minus any Monthly Deduction allocated to that Segment, plus any Interest Credit from the Index Segment, minus any transfers or withdrawals from the Index Segment, minus any charges on the Index Segment, minus any loans removed from the Index Segment.

36.    The Index Account Value is the sum of the Index Segment values from the preceding month.

37.    According to the Policy, the Index Selections are set forth on the Schedule of Policy Benefits.

38.    According to the Schedule of Policy Benefits, the Policy offers four Index Selections.

39.    The Index Selections are "engineered indices." They are comprised of notional assets. In other words, they do not own any stocks, bonds or other assets. The indices cannot be invested in because there is nothing in which to invest. The indices simply track the returns of underlying assets. They are used by Defendant to calculate the amount of Index Credits to be credited to the Policy Account Value.

40.    There are four Index Selections. The first is the S & P 500 Composite Stock Price Index. The second is the S & P 400 Composite Stock Price Index. The third is the Russell 2000 Composite Stock Price Index. The fourth is the Fidelity Multifactor Yield 5% ER Index ("Fidelity Index").

41.    The Policy states that the Fidelity Index is "a multi-asset index, offering exposure to companies with attractive valuations, high quality profiles, positive momentum signals, lower volatility and higher dividend yield than the broader market, as well as U.S. Treasuries, which may reduce volatility over time." The Fidelity Index purportedly has the most conservative investment profile of the four indices.

42.    The Fidelity Index is available under the Policy with two Index Crediting Methods. According to the Policy, one method has a higher Index Participation Rate than the other method. But, the Policy provides no further description of the two methods.

43.    The Index Participation Rate is "the portion of the Index growth that will be used in the calculation of the Index Credit." For example, a 200% Index Participation Rate means that the Index Credit is supposed to be double the increase in the Index Selection.

44.    The Fidelity Index Selections have a 35% Minimum Participation Rate.

45.    The Index Floor Rate is the minimum interest rate used in the calculation of the Index Credit. For example, a 0% Index Floor Rate means that no Index Selection losses are credited to the Index Segment.

### C.  *The Illustration*

46.    The Policy states that the Illustration from the Defendant or its agent "helps explain how the Policy works."

47.    The Illustration further describes the Fidelity Index Selections offered under the Policy.

48.    The Illustration states that an "Index is the numerical value used to measure the performance of a group of stocks and/or bonds excluding dividends." It further states that each Fidelity Index is an "Index" under the Policy.

49.    The Illustration states that the Fidelity Index Selection has a 120% Index Participation Rate and the High Participation Fidelity Index Selection has a 210% Index Participation Rate for Index Crediting Methods.

50.    The Illustration contains "Historical Change Detail" for the Fidelity Index and Index Crediting Methods.

51.    It includes a chart ("Chart") purporting to show the annual historical Index Change in the Fidelity Index for each year from 2003 through 2022.

52.     The Chart also purports to show historical changes in the two Fidelity Index Selection Index Crediting Methods using the Index Participation Rates alleged above and a 0% Index Floor Rate. It also purports to show the average annual historical change in the Fidelity Index Selection Crediting Methods.

53.     Plaintiff, like all Policy owners, was required to sign and signed an "Acknowledgement" that stated that he "received, reviewed and understand[s] all pages of this Illustration."

54.     Defendant also required its agent who sold Plaintiff his Policy, as Defendant required all its sales agents on all Policy sales, to: "certify that this life insurance illustration has been presented to the applicant," that "I have explained all non-guaranteed elements illustrated are subject to change," and that "I have made no statements that are inconsistent with the illustration or any promises about future performance or the values of this policy."

55.     Accordingly, part of Defendant's required sales process is verification that customers, including Plaintiff and the members of the Class, have received and reviewed the Illustration and were not provided with any information inconsistent with the Illustration.

### D. *The Disclosure Material*

56.     The Disclosure Material states that the Index Selections do not invest premiums "in stocks, bonds or equity investments."  Instead, the Policy "may earn interest based on the movement of the selected index(es.)"

57.     The Disclosure Material states that the "illustrated values are based on Past Index performance."

58.     It also states that the Policy "will never credit less than zero percent," meaning that it had a 0% Floor.

59.     Plaintiff, like all Policy owners, was required to "acknowledge that I have read this disclosure material and received a copy." Plaintiff signed the acknowledgement electronically on December 11, 2023.

60.     Defendant also required its agent who sold Plaintiff his Policy, as Defendant required all their sales agents on all Policy sales, to: "certify that I have provided a copy to and reviewed this disclosure material with the applicant," that "I have explained all non-guaranteed elements illustrated are subject to change," and that "I have made no statements that are inconsistent with the illustration or any promises about future performance or the values of this policy." Defendant's agent, Mathew Koch, signed the certification electronically on December 11, 2023.

### E.  *Defendant's Misleading Description of the Fidelity Indices*

61.     Defendant licensed the Fidelity Index from Fidelity Product Services LLC for use in the Policy.

62.     Defendant is solely responsible for the contents of the Policy, Illustration and Disclosure Materials concerning the Fidelity Index Selection used in connection with the sale of the Policies.

### i.  *Contrary to the Policy Terms, the Fidelity Index Selection is an Excess Return Index*

63.     As alleged above, the Policy states that the Fidelity Index is "a multi-asset index, offering exposure to companies with attractive valuations, high quality profiles, positive momentum signals, lower volatility and higher dividend yield than the broader market, as well as U.S. Treasuries, which may reduce volatility over time."

64.     According to a May 24, 2024, Fidelity Investments Brochure (the "Brochure"), which was *not* provided  to Plaintiff during the sales process, "the Fidelity Index is "a rules-

based asset allocation strategy that attempts to adaptively allocate exposure between (i) an equity portfolio (the "Equity Component") (ii) a notional portfolio invested in U.S. 10 year Treasury Note futures (the "Fixed Income Component") and (iii) an allocation to cash that earns zero return." The Index has" a volatility targeting mechanism that seeks to achieve annualized volatility of 5%."

65.    The "Equity Component tracks the *excess return* performance of the Fidelity U.S. Income Factor Index" (emphasis added).

66.    According to the Brochure, the Fidelity U.S. Income Factor Index "is comprised of six underlying equity factor indices."

67.    The Brochure further states that the Equity Component "level returns are computed net of the financing costs, which are set at the Fed Funds Rate." In other words, only the excess return above the Fed Funds Rate is the Index Credit for the Equity Component credited to the Fidelity Index Segment.

68.    On January 10, 2024, when the Policy was issued, the Fed Funds Rate was over 5%. Therefore, the Equity Component of the Fidelity Index Segment *had to earn over 5% just to "break even"* (the "Equity Break Even Rate").

69.    The Brochure states that the "Fixed Income Component tracks the *excess return* performance of a notional portfolio of U.S. 10-year Treasury Note Futures, and an allocation of cash that earns zero return." (emphasis added.) In other words, only the excess return above the U.S. 10-year Treasury Note rate is the Index Credit for the Fixed Income Component credited to the Fidelity Index Segment.

70.    On January 10, 2024, when the Policy was issued, the U.S. 10-year Treasury Note rate was over 4%. Therefore, the Fixed Income Component of the Fidelity Index Segment had to earn **had to earn over 4% just to "break even"** (the "Fixed Income Break Even Rate").

71.    By excluding the Fed Funds and 10-year Treasury Note rates, the Fidelity Index Segment Index Credits exclude a material component of the returns generated from investments in "companies with attractive valuations, high quality profiles, positive momentum signals, lower volatility and higher dividend yield than the broader market, as well as U.S. Treasuries." The Index Credits only include these returns **minus** the Equity and Fixed Income Break Even Rates. The exclusion of these returns is effectively a massive undisclosed "fee."

72.    As a result, the Fidelity Index Segment Index Credits were not calculated or credited as promised under the Policy.

73.    Defendant misleadingly failed to disclose that the Fidelity Index Segment returns were limited to the excess above the Equity and Fixed Income Break Even Rates.

74.    Defendant failed to disclose any projection or other information concerning the amount of the Equity and Fixed Income Break Even Rates, or even how those rates are calculated.

### ii.    *Defendant's Misleading Description of the Index "Historical" Returns*

75.    As alleged above, the Illustration states that 20 years' of returns for the Fidelity Index and the Fidelity Index Selection Index Crediting Methods were "historical."

76.    In fact, these returns were not historical for the simple reason that the Fidelity Index **did not exist** prior to December 11, 2019. According to the Brochure, the Fidelity Index Launch Date was December 11, 2019. Consequently, at most, only 5 years of returns could have been historical.

77.    Because the Illustration promised that the Fidelity Index and the Fidelity Index Selection Index Crediting Methods were "historical," the promises in the Illustration were fraudulent and misleading.

78.    In addition to the fact that the returns were not historical, the "historical" returns were also deceptive and materially misleading as discussed below because they were based on back-casted data.

### a.   The Recognized Potential of Back-Casted Returns to Mislead

79.    Regulators and regulatory bodies, including the National Association of Insurance Commissioners (the "NAIC"), have recognized the potentially misleading nature of back-casted proprietary indices used to illustrate or promote annuities. For example, the following Bulletin issued by the Iowa Insurance Commissioner to insurance companies issuing annuities in Iowa highlights the abuses associated with the Policies:

> Similarly, some marketing materials depict charts of recently developed "proprietary indices," which did not exist during the illustrated time frame, but are back-casted and hypothetically demonstrate how they would have outperformed traditional indices. … Using these hypothetical performance charts is misleading if they, directly, or indirectly through subsequent representations by producers, are used to project future performance and contribute to inflated consumer expectations.

"Bulletin 14-02" issued September 15, 2014 (emphasis added).

80.    Similar concerns about the use of back-casted proprietary indices in sales illustrations and marketing materials were voiced by New York Life, MetLife and Northwestern Mutual in submissions to the NAIC:

> [M]any market participants utilize the practice of calculating hypothetical historical returns. These hypothetical look back calculations take into account the past performance of the underlying index, but not interest rates, volatility or option prices, which are drivers of the non-guaranteed elements. In certain economic environments, the hypothetical look back approach may allow maximum illustrated rates that are not appropriate for general account life insurance policies and, if used improperly, could be misleading to purchasers….

Statement to NAIC on "Actuarial Guidelines on IUL Illustrations" dated September 5, 2014.

81.     Finance experts have acknowledged the actual and potential abuses stemming from backcasted projections resulting from the selection of unrepresentative benchmark time periods, overfitting, data mining, volatility filters and similar assumptions. *See e.g.,* G. Deng, C. McCann and M. Yan, "Structured Products and the Mischief of Self-Indexing," The Journal of Index Investing (Spring 2017); O. Safarti, "Backtesting: A Practitioner's Guide to Assessing Strategies and Avoiding Pitfalls," CBOE 2015 Risk Management Conference.

82.     According to an article entitled "Engineered Indices and FIA," engineered indices "have come to play an increasingly pivotal role in how Indexed UL products are illustrated and sold." According to the article, "[t]he fundamental problem with this hypothetical lookback methodology is that it can be easily gamed because the data is already known. All you have to do to optimize and index or a crediting strategy is to back-fit the data if you want to increase the illustrated performance."[2]

### b.  <u>The Fidelity Index Returns Were Back-Casted</u>

83.     Defendant made deceptive and materially misleading representations about the returns of the Fidelity Index.

84.     The Fidelity Index is a notional index, meaning it does not hold any assets. The Equity Component simply tracks the Fidelity U.S. Income Factor Index, which is in turn tracks six underlying equity factor indices. Fixed Income Component tracks a notional portfolio of U.S. 10-year Treasury Note Futures.

---

[2] This article was included in materials for the fall meeting of the National Association of Insurance Commissioners at pdf page 47-48. https://content.naic.org/sites/default/files/national_meeting/A_Cmte_Materials%2012-1-23.pdf

85.    Defendant does not buy shares or otherwise invest directly in any index or sub-index. Instead, it purchases the futures contracts underlying the sub-indices and credits any gains net of expenses as Index Credits.

86.    Additionally, volatility control is imposed daily through infusions or withdrawals of cash. If the market is moving rapidly up or down by more than 5%, then cash is infused. Since the cash generally earns a nominal, positive return, the impact of the cash infusion is to dilute and "water down" the positive or negative returns for the portfolio. When volatility subsequently decreases, then cash is withdrawn, and the relevant index earns a greater percentage of the gains and losses from the underlying portfolio.

87.    If volatility control is imposed and cash dilutes the positive returns of the portfolio during a period of rapid market price increases, the Fidelity Index does not take advantage of all of these significant market increases, thereby making high returns harder to obtain.

88.    In the Brochure, Fidelity explained about its back-cast model for the Fidelity Index:

> The Index has been calculated by the Index Calculation Agent for the period from the Index Launch Date. The past performance of the Index prior to the Index Launch Date has been derived from a back-testing simulation by applying the Index methodology to published historical levels of Index constituents. Back-tested performance is provided for illustrative purposes only and should not be regarded as an indication of future performance. The back-testing simulation assumed that there were no market disruption events and no extraordinary events affecting Index constituents.  A simulation based on different assumptions may produce different results.

89.    The Policy and Illustration, in sharp contrast, only represent that the Fidelity returns on the Chart are historical and, therefore, without the risk that "different assumptions may produce different results."

90.     The Fidelity Index Selection Index Crediting Method returns were particularly egregious because the Chart rates are based on a 0% Floor Rate and a Participation Rate above 100%. For example, to achieve a 210% Participation Rate for the High Participation Fidelity Index Selection, Defendant would have to buy more than twice as many futures contracts than if they were crediting returns based on the performance of Fidelity Index alone. Those contracts have a cost, and the expense associated with these additional contracts would be a further reduction in the returns credited under the Policy from the Fidelity Index.

91.     Moreover, a 0% Floor Rate is essentially insurance against any loss. To provide that insurance, Defendant must buy options to hedge against the prospect that the value of the futures contracts that are designed to replicate the Fidelity Index do not fall in value. These options have a cost, and the expense associated with these hedge options would result in a further reduction of the Index Credits under the Policy.

92.     As a result of these additional costs, the rates shown on the Chart are even more misleading.

93.     According to an article in InsuranceNewsNet Magazine,[3] since its inception, the Fidelity Index is down 1.03 % whereas over the same period, the S & P 500  is up 51.83%.

### iii. Defendant's Misleading Description of the Volatility Control

94.     As alleged above, volatility control dampens the effects of rapid market moves. Accordingly, with volatility control, an Index may rise less in a rapidly rising market but fall less in a rapidly falling market.

---

[3] https://insurancenewsnet.com/innarticle/the-real-cost-of-volatility-controlled-indices-in-iul-policies

95.    But, the Illustration provides no information concerning how the volatility control is determined or the factors relating thereto. Therefore, Plaintiff could not evaluate how volatility control might reduce the performance of the Fidelity Index in the future.

### F.  *Plaintiff Has Been Harmed By Defendant's Misleading Descriptions*

96.    Plaintiff allocated 50% of the Account Value under his Policy to the Fidelity Index Segment with a 120% Index Participation Rate.

97.    Plaintiff has paid thousands of dollars to Defendant in Policy premiums.

98.    The Fidelity Index has not performed as promised.

99.    Plaintiff has been damaged for the reasons set forth above.

## FEDERAL RICO ALLEGATIONS

100.    RICO provides a civil cause of action for private plaintiffs and authorizes substantial remedies, including the availability of treble damages and attorneys' fees. Establishing a RICO violation requires proof by a preponderance of the evidence of "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496–97 (1985) (interpreting § 1964(c)).

### A.  *The Enterprise*

101.    Each Defendant is a "person" within the meaning of 18 U.S.C. § 1961(3). Plaintiffs and the other members of the Class defined below are each "persons" within the meaning of 18 U.S.C. §1961(3), and each of them has sustained injury to their business or property as a result of the acts and the conduct of Defendant and the Sales Channel Persons described herein.

102.    Defendant and the Sales Channel Persons (including the IMOs, BGAs and independent agents) associated in fact as an "enterprise" within the meaning of 18 U.S.C. §

1961(4) to market and sell the fraudulent Policies. This association in fact is referred to herein as the "Enterprise." As alleged more fully in the following paragraphs, the Enterprise has an ascertainable and ongoing and continuous existence that is separate from the alleged pattern of racketeering activities and members who have existences and activities that are separate and distinct from those of the Enterprise.

### B. *Ascertainable Structure and Control of Enterprise*

103.    The Enterprise is an ongoing and continuing organization of entities associated for the common or shared purpose of selling the fraudulent Policies. Each member of the Enterprise has a clearly defined role in the fraudulent affairs of the Enterprise.

104.    The Enterprise is directed by Defendant, who (1) creates the Policies, creates and disseminates all Illustrations and Disclosure Materials used to sell the Policies, (2) requires that the Sales Channel Persons strictly comply with the fraudulent scheme concerning the sale of Policies and (3) collects the proceeds of the Enterprise.

105.    The Sales Channel Persons market and sell the Policies throughout the United States as directed by Defendant.

106.    There is a hierarchical operating and decision-making structure governing the activities of the Enterprise:

- Defendant provides the Sales Channel Persons with and require the use of uniform misleading marketing materials, Illustrations, Disclosure Materials and Policies—and prohibits the Sales Channel Persons from using any other marketing materials, Illustrations and Policies. For example, according to Defendant's Agent Advertising Guidelines, any information which references Defendant's insurance products "by name, description, rate or features" must be submitted "for advertising review and

approval **PRIOR TO USE**." (emphasis in original.) Moreover, even information that does not mention Defendant or its products is subject to submission and review "if used to solicit sales, to secure sales or to secure appointments with consumers…."

- Agents selling the Policies to customers must certify in writing that they have not told the customer anything inconsistent with the misleading Illustration or with the fraudulent scheme.

- As set forth in the Disclosure Material, an agent must certify that "I have completed the Company's Indexed universal Life Certification Training and passed the Agent Certification Exam."

- The Sales Channel Persons receive commission payments from Defendant based upon how successful they are in selling the Policies based on Defendant's fraudulent materials.

107.    Defendant's fraudulent scheme to sell the Policies through the Sales Channel Persons has been wildly successful. Midland and its parent Sammons are among the most successful sellers of IUL policies in the United States, and IUL is also the fastest growing segment of the life insurance market.[4]

108.    Defendant thus exercises substantial control over the direction of the Enterprise by, inter alia:

- designing and issuing the fraudulent Policies offered for sale to consumers throughout the United States;

---

[4]*See* https://www.limra.com/siteassets/newsroom/fact-tank/sales-data/2024/2q/2q-2024-ytd-iul-rankings.pdf and https://www.limra.com/siteassets/newsroom/fact-tank/sales-data/2024/1q/first-quarter-2024-iul-sales-rankings.pdf.

- designing and distributing fraudulent Illustrations describing the supposed features of the Policies, including the Indexed Strategies;

- developing uniform and fraudulent sales and marketing materials, standardized contracts, and Illustrations; and

- instructing and requiring Sales Channel Persons to use ***only*** standardized Illustrations sales materials that comprise the fraudulent scheme.

- Requiring Agents selling the Policies to certify in writing that they have not told the customer anything inconsistent with the misleading Illustration or with the fraudulent scheme.

- Requiring Agents selling the Policies to certify in writing that they have completed the Company's Indexed universal Life Certification Training and passed the Agent Certification Exam."

109.    As a result of Defendant's scheme, the Policies are among the most widely sold and popular such products in the U.S.

## C. *Continuous Existence*

110.    The Enterprise has had an ongoing and continuous existence during the Class Period.

111.    Throughout the Class Period, the members of the Enterprise associated in fact to market and sell the Policies. Defendant developed, marketed and sold a continuous stream of Policies that were sold through the Sales Channel Persons.

112.    Likewise, the Sales Channel Persons sold Defendant's Policies to consumers on an ongoing basis each year during the Class Period, and they participated actively in the affairs of the Enterprise through their sales activities for the Policies.

113.    The Enterprise has displayed a continuity of membership during the Class Period. Defendant has acted continuously in their leadership role, while the Sales Channel Persons have provided services to the Enterprise throughout the Class Period, such that there has been a stable network of participants in the Enterprise year after year.

114.    On information and belief, the Enterprise continues to offer the Policies through the present day.

### D.  *Separate Existence*

115.    Each member of the Enterprise has an existence separate from the participation in the racketeering activities of the Enterprise.

116.    Defendant and each of the IMOs, BGAs and independent broker agents who comprise the Sales Channel Persons are all organized as separate corporations, entities or persons, with separate books and records, separate accounts, and separate existences for legal and regulatory purposes.

117.    The Enterprise also has an existence and structure that is separate and distinct from other affairs of its members. Members of the Enterprise engage in legitimate business operations separate and apart from their activities on behalf of the Enterprise. In addition to the Policies sold by the Enterprise, Defendant and the Sales Channel Persons market and sell many other insurance products.

118.    The involvement of separate corporations and entities in the Enterprise provides a separate, ascertainable structure to the Enterprise. In addition, because the members of the Enterprise perform activities on behalf of the association-in-fact that are separate from the alleged racketeering activities, including the sale of products other than the Policies, the Enterprise also has an existence separate from the alleged racketeering activities themselves.

Also, because each of the members of the Enterprise engages in separate lawful activities apart from their activities on behalf of the Enterprise, each of them has a separate existence that extends beyond the Enterprise and beyond the alleged racketeering activities themselves.

119.    However, because the members of the Enterprise engage in conduct on behalf of the Enterprise that are not lawful or regular business activities, the racketeering activities of the Enterprise are not simply the normal business activities of Defendant. For all of these reasons, the Enterprise has an ascertainable and continuing existence that is separate from the racketeering activities themselves and the alleged racketeering activities of the Enterprise are not co-extensive with the ordinary business of Defendant.

### E.  *Interstate Commerce*

120.    The Enterprise functions, in part, by deceiving consumers nationwide concerning the nature and operation of the indices incorporated into the Policies sold through and on behalf of the Enterprise. Defendant and the Sales Channel Persons, through the Enterprise, have engaged in a pattern of racketeering activity which also involves a scheme to increase revenue for Defendant and the Sales Channel Persons through fraudulent and/or misleading representations and omissions concerning the nature and performance of the indices offered by the Policies.

121.    The Enterprise engages in and affects interstate commerce because it involves activities across state boundaries, such as the marketing, promotion, advertisement and sale of the Policies to consumers nationwide, and the receipt of premiums, commissions, and surrender charges from the sale of those Policies.

122.    At all relevant times, each associate in the Enterprise was aware of the fraudulent scheme to sell the Policies, was a knowing and willing participant in the fraudulent scheme, and reaped profits therefrom.

### F. *Predicate Acts*

123.    Section 1961(1)(B) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud). As set forth herein, Defendant has engaged and continue to engage in conduct violating each of these laws to effectuate their scheme.

124.    For the purpose of executing and/or attempting to execute the above-described knowing scheme to sell the challenged Policies by misrepresenting and omitting material information regarding the critical attributes of the Fidelity Index, which if disclosed, would reveal these Policies to be inferior to alternative investments, Defendant, in violation of 18 U.S.C. § 1341, placed in post offices and/or in authorized repositories matter and things to be sent or delivered by the Postal Service, caused matter and things to be delivered by commercial interstate carriers, and received matter and things from the Postal Service and/or commercial interstate carriers, including, but not limited to marketing brochures, the Policies, disclosure forms, performance illustrations, applications, contracts, training manuals, video tapes, correspondence, leads lists, premium and commission payments, reports, data, summaries, statements and other materials relating to the marketing and sale of the Policies.

125.    For the purpose of executing and/or attempting to execute the above-described knowing scheme to defraud or obtain money by means of false pretenses, representations or promises, Defendant, also in violation of 18 U.S.C. § 1343, transmitted and received by wire, matter and things, which include, but are not limited to, the marketing brochures, the Policies,

disclosure forms, performance illustrations, applications, contracts, training manuals, video tapes, correspondence, leads lists, premium and commission payments, reports, data, summaries, statements and other materials relating to the marketing and sale of the Policies. In addition, pursuant to and as part of the scheme to defraud, Defendant intended to and did receive payments from Plaintiffs and other members of the Class that were transmitted or cleared through the use of interstate wires in violation of 18 U.S.C. § 1343.

126.    The Sales Channel Persons aided and abetted violations of the above laws.

127.    Many of the precise dates of Defendant's fraudulent uses of the U.S. Mail and wire facilities have been deliberately hidden and cannot be alleged without access to its books and records. Indeed, the success of the fraudulent scheme depends upon secrecy, and Defendant has withheld details of their scheme from Plaintiffs and other members of the Class. Generally, however, Plaintiff can describe the occasions on which the predicate acts of mail and wire fraud occurred, and how those acts were in furtherance of a scheme. They include thousands of internet postings and communications to perpetuate and maintain the scheme, including, among other things:

- Delivery and return of the Policies and Illustrations;

- Processing of applications for the Policies and verifications of the Illustrations;

- Processing premium payments from purchasers of the Policies;

- Paying and receiving commissions for the marketing, referral and sale of the Policies;

- Disseminating fraudulent and deceptive marketing and sales brochures, illustrations and other materials describing the Policies to the Sales Channel Persons; and

- Disseminating training materials for selling the Policies.

128. The foregoing materials sent or received by Defendant by the U.S. Mail, internet postings, emails, wire or other electronic media contained, *inter alia*:

- False and/or misleading representations and omissions about the nature and performance of the Policies and Indexed Strategies; and

- False and/or misleading representations and omissions about historical performance of the Policies and the Indexed Strategies, through false and misleading "back-casting."

129. Defendant's management at its corporate headquarters has communicated by U.S. Mail, wire, internet postings, emails and by facsimile with the Sales Channel Persons in furtherance of their scheme with the Sales Channel Persons.

130. Defendant's false and/or misleading representations and omissions of material facts were knowing and intentional and made for the purpose of deceiving Plaintiff and the other members of the Class.

131. Defendant and its co-conspirators either knew or recklessly disregarded the fact that their false and/or misleading representations and omissions were material and were relied upon by Plaintiff and the other members of the Class as shown by their payments to Defendant for the Policies, the verifications of the Illustrations, and the allocation to the Fidelity Index Segment.

132. Although not necessary to make out a violation of the mail or wire fraud statute,[5] Plaintiff and the other members of the Class relied, to their detriment, on Defendant's false and/or misleading representations and material omissions, which were made by means of

---

[5] *See Bridge v. Phoenix Bond & Indemnity Co.*, 128 S. Ct. 2131 (2008).

Defendant's uniform Policies and Illustrations. Again, such reliance is evidenced by their purchase of the Policies, the verifications of the Illustrations, and the allocation of the Fidelity Index Segment, which they would have no reason to select absent Defendant's misleading description of those indices.

133.    Furthermore, as a direct and proximate consequence of Defendant's false and/or misleading representations and material omissions, Defendant and its co-conspirators were able to increase the price and cost of the Policies, including the fees and charges collected by members of the Enterprise, for all members of the Class, thereby overcharging all such class members. For example, as a direct and proximate result of the false and/or misleading representations and omissions described above, Defendant induced members of the Class to allocate Account Values to the Fidelity Index Segment, charging all class members with annual spreads and other charges that would not apply to allocations made under different options or to premiums paid for policies that do not use such proprietary indices, thereby increasing the price and cost of the Policies to all Class members.

134.    Defendant knew the Plaintiff and the other members of the Class relied on its false and/or misleading representations and omissions about the nature and performance of the Fidelity Index Segment. Defendant knew that the purchasers of the Policies would incur substantial cost and loss as a result.

135.    Consequently, Defendant obtained money and property belonging to Plaintiff and the other members of the Class, who have been injured in their business or property by Defendant's overt acts of mail and wire fraud, and by its aiding and abetting each other unnamed co-conspirators' acts of mail and wire fraud.

### G. *Conducting the Affairs through a Pattern of Racketeering Activity*

136.    Defendant has engaged in a "pattern of racketeering activity," as defined by 18 U.S.C. § 1961(5), by committing or aiding and abetting in the commission of at least two acts of racketeering activity, i.e., indictable violations of 18 U.S.C. §§ 1341 and 1343 as described above, within the past ten years. In fact, Defendant has committed or aided and abetted in the commission of countless acts of racketeering activity. Each racketeering act was related, had a similar purpose, involved the same or similar participants and method of commission, had similar results, and impacted similar victims, including the Plaintiff and other members of the Class.

137.    The multiple predicate acts of racketeering activity that Defendant committed and/or conspired to, or aided and abetted in the commission of, were related to each other and form part of the Enterprise's ongoing and regular way of doing business. Together they amount to and pose a clear threat of continued racketeering activity, as evidenced by the ongoing sale of the Policies, and therefore constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5). In other words, the misconduct alleged by Plaintiff occurred and went on long enough and with enough of a relationship with the Enterprise to constitute a pattern of racketeering activity actionable under RICO.

## CLASS ACTION ALLEGATIONS

138.    Plaintiff brings this case as a class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of herself Class defined as follows:

> All persons who own or owned a Midland IUL universal life policy issued by Defendant and who allocated some or all of the Accumulated Value under those Policies to the Fidelity Index.

139.    Excluded from the Class are the Defendant, any entity in which the Defendant has a controlling interest, any of the officers, directors, or employees of the Defendant, the legal representatives, heirs, successors, and assigns of the Defendant, anyone employed with Plaintiff's counsel's firms, any Judge to whom his case is assigned, and the Judge's immediate family.

140.    The members of the Class are so numerous that joining all members is impractical. Upon information and belief, the Class includes thousands of persons.

141.    Plaintiff is willing and prepared to serve the Court and the proposed Class in a representative capacity. Plaintiff will fairly and adequately protect the interests of the Class and has no interest that is adverse to, or which materially conflicts with, the interests of other members of the Class. Plaintiff has also engaged the services of legal counsel who are experienced in complex class litigation, will adequately prosecute this action, and will assert and protect the rights of an otherwise represent Plaintiff and the other members of the putative Class.

142.    Plaintiff's claims are typical of the claims of the members of the Class because the express terms of the Policies purchased from Defendant by Plaintiff and Class members contain materially identical Illustrations concerning Indexed Strategies.

143.    There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class Members. Common legal and factual questions include:

        (a) Whether Defendant's conduct is actionable as a breach of contract under the common law of the respective states;

(b) Whether Defendant uniformly made false and/or misleading representations and omitted material information regarding the nature and performance of the Indexed Strategies, and thus of the Policies;

(c) Whether Defendant engaged in mail and/or wire fraud;

(d) Whether Defendant engaged in a pattern of racketeering activity;

(e) Whether the Enterprise is an "enterprise" within the meaning of 18 U.S.C. § 1961(4);

(f) Whether Defendant and the Sales Channel Persons conducted or participated in the affairs of the Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c).

(g) Whether Plaintiffs and the other members of the Class are entitled to damages from Defendant, and, if so, in what amount.

144. The questions set forth above predominate over any questions affecting only individual persons, and a class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiff and Class members. The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of these claims. Even if class members could afford to pursue individual litigation, the court system could not. Individualized litigation would risk inconsistent or contradictory judgments while increasing the delay and expense to all parties, and to the judicial system, from the complex legal and factual issues presented here. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court.

145.    Certification is warranted under Rule 23(b)(3) because questions of law or fact common to the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

## **CLAIMS FOR RELIEF**

## **FIRST CLAIM**

### **Breach of Contract on behalf of Plaintiff and the Class**

146.    Plaintiff re-alleges all prior allegations in the Amended Complaint.

147.    Plaintiff and the Class purchased Policies from Defendant.

148.    The Policies are valid and enforceable contracts between Defendant and Plaintiff and the Class.

149.    Plaintiff and the Class substantially performed their obligations under the Policies.

150.    As set forth above, the Policies promised Plaintiff and the Class that they could allocate a portion of their Policy Account Values to the Indexed Selections *as described in the Policies and Illustrations*.

151.    However, as set forth above, the Indexed Selections actually provided by Defendant for the allocation of Policy Account Values did not match the substantive qualities of those strategies as promised and described in the policies, in at least the three ways alleged above.

152.    First, Defendant breached its promise that the Fidelity Index was a total return fund when in fact it was an excess return fund. As a result, it had the potential to earn a positive return only after exceeding the break-even rate.

153.    Second, Defendant breached its promise that the Fidelity Index had 20 years of historical returns when, in fact, they had been in existence for only a fraction of that time period and, therefore, could not have had any historical returns. In fact, these "historical" returns were a fiction of a back-casting model.

154.    Third, Defendant provided misleading data with respect to the Fidelity Index Selection Index Crediting Method in that the rates are based on a 0% Floor Rate and a Participate Rate above 100%. These rates created hidden costs for Plaintiff, resulting in a further reduction in the returns credited under the Fidelity Index.

155.    Finally, Defendant provided a misleading volatility control description for the Fidelity Index in its Illustration.

156.    Defendant's failure to provide Indexed Selections as promised and described constitutes a breach of the Policies.

157.    As a direct and proximate result of Defendant's ongoing and continuing breach, Plaintiff and the Class have sustained damages that are continuing in nature in an amount to be determined at trial.

## SECOND CLAIM

### Violation of RICO, 18 U.S.C. § 1962(c) on behalf of Plaintiff and the Class

158.    Plaintiff re-alleges all prior allegations in the Amended Complaint.

159.    This claim arises under 18 U.S.C. § 1962(c), which provides in relevant part:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . .

160.    In violation of 18 U.S.C. §1962(c), Defendant has conducted or participated, directly or indirectly, in the conduct of the affairs of the Enterprise through a "pattern of

racketeering activity," as defined by 18 U.S.C. §1961(5). Therefore, Defendant has violated 18 U.S.C. §1962(c).

161.    As a result and by reason of the foregoing, Plaintiff and the other members of the Class have been injured, suffered irreparable harm and sustained damage to their business and property, and are therefore entitled to recover actual and treble damages, and their costs of suit, including reasonable attorney fees, pursuant to 18 U.S.C. § 1964(c).

162.    In addition, because Defendant has violated 18 U.S.C. §§ 1962(c), and absent equitable relief from the Court will continue to do so in the future, enjoining Defendant from committing these RICO violations in the future and/or declaring their invalidity is appropriate pursuant to 18 U.S.C. § 1964(a), which authorizes the district courts to enjoin violations of 18 U.S.C. § 1962.

### THIRD CLAIM

**Common Law Fraud on behalf of Plaintiff and a Common Law Fraud Subclass**

163.    Plaintiff re-alleges all prior allegations in the Amended Complaint.

164.    Plaintiff resided in, and was a citizen of, Michigan at the time he purchased his Policy.

165.    As set forth above, the Policies promised Plaintiff and the Class that they could allocate their Accumulated Values to the Indexed Strategies *as described in the Policies and Illustrations*.

166.    However, as set forth above, the Indexed Strategies actually provided by Defendants for the allocation of Accumulated Values did not match the substantive qualities of those strategies as promised and described in the policies, in at least the three ways alleged above.

167.    Accordingly, Defendant made misrepresentations in the Policies that were both material and false.

168.    Defendant's misrepresentations were knowing or reckless.

169.    Defendant made its misrepresentations with the intention that Plaintiff and other putative Class members would act upon them.

170.    Plaintiff and putative Class Members acted upon Defendant's misrepresentations and, as a direct and proximate result of Defendant's misrepresentations, Plaintiff and the Class have sustained damages that are continuing in nature in an amount to be determined at trial.

171.    In addition to himself and Michigan policy holders, Plaintiff also brings this claim on behalf of putative Class Members in other states with substantially similar common law fraud doctrines, and will seek certification of a subclass on behalf of policyholders whose Policies were purchased in those states.

## FOURTH CLAIM

**Common Law Innocent Misrepresentation on behalf of Plaintiff and a
Common Law Innocent Misrepresentation Subclass**

172.    Plaintiff re-alleges the allegations in ¶¶ 1-162 in the Amended Complaint.

173.    This claim is pled in the alternative to the Third Claim (Common Law Fraud) plead at ¶¶ 163-171 above.

174.    Plaintiff resided in, and was a citizen of, Michigan at the time he purchased his Policy.

175.    As set forth above, the Policies promised Plaintiff and the Class that they could allocate their Accumulated Values to the Indexed Strategies *as described in the Policies and Illustrations*.

176.    However, as set forth above, the Indexed Strategies actually provided by Defendants for the allocation of Accumulated Values did not match the substantive qualities of those strategies as promised and described in the policies, in at least the three ways alleged above.

177.    Accordingly, Defendant made misrepresentations in a transaction between Defendant and Plaintiff and other putative Class Members that were false.

178.    Plaintiff and other putative Class Members were deceived by, and relied upon, Defendants' misrepresentations.

179.    As a direct and proximate result of Defendant's misrepresentations, Plaintiff and the Class have sustained damages that are continuing in nature in an amount to be determined at trial.

180.    The loss that Plaintiff and putative Class Members have suffered as a result of Defendants' misrepresentations have inured to Defendant's benefit.

181.    In addition to himself and Michigan policy holders, Plaintiff also brings this claim on behalf of putative Class Members in other states with substantially similar common law innocent misrepresentation doctrines, and will seek certification of a subclass on behalf of policyholders whose Policies were purchased in those states.

## PRAYER FOR RELIEF

For these reasons, Plaintiff prays that judgment be entered against Defendant and requests that the Court award the following relief:

A.    An order certifying the Class, appointing Plaintiff as a representative of the Class, appointing Plaintiff's counsel as Class counsel, and directing that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the Class members;

B.    A judgment against Defendant for the causes of action alleged against it;

C.    An Order awarding Plaintiffs and Class members entitled to such other equitable relief as the Court deems proper;

D.    Compensatory damages in an amount to be proven at trial;

E.    Punitive, treble and exemplary damages;

F.    Pre-judgment and post-judgment interest at the maximum rate permitted by law;

G.    Plaintiffs' attorneys' fees, expert witness fees and other costs;

H.    Any other relief the Court determines is just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury of all claims so triable.

Dated: July 2, 2025                                  Respectfully submitted,

/s/ Robert A. Izard
Robert A. Izard (*pro hac vice*)
Craig A. Raabe (*pro hac vice*)
Seth R. Klein (*pro hac vice*)
IZARD, KINDALL & RAABE LLP
29 South Main Street, Suite 305
West Hartford, CT  06107
Tel: (860) 493-6292
Fax: (860) 493-6290
rizard@ikrlaw.com
craabe@ikrlaw.com
sklein@ikrlaw.com

Joseph Gentile (*pro hac vice*)
Ronen Sarraf (*pro hac vice*)
SARRAF GENTILE LLP
10 Bond Street #212
Great Neck, NY 11021
Tel: (516) 699-8890
Fax: (516) 699-8968
joseph@sarrafgentile.com
ronen@sarrafgentile.com

Michael C. Kuehner AT0010974
Michael Kuehner Law, PLC
4300 Grand Avenue
Des Moines, Iowa 50312
Tel: (641) 425-4764
Fax: (515) 505-3434
michael@kuehnerlawfirm.com

ATTORNEYS FOR PLAINTIFF JACK R.
BADER

## CERTIFICATE OF SERVICE

I, Seth R. Klein, hereby certify that a true copy of the foregoing document filed through the ECF system will be electronically sent to the registered participants as identified on the Notice of Electronic Filing on July 2, 2025.

*/s/ Seth R. Klein*
Seth R. Klein