**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

|  |  |
|---|---|
| JACK R. BADER, individually and on behalf of all others similarly situated, | Civil Action No. 4:25-cv-0020 |
| Plaintiff, | |
| vs. | |
| MIDLAND NATIONAL LIFE INSURANCE COMPANY | CLASS ACTION |
| Defendant. | |

**PLAINTIFF'S RESISTANCE TO DEFENDANT'S MOTION TO DISMISS**

## TABLE OF CONTENTS

I.      RELEVANT BACKGROUND ........................................................................................1

        A.      The Policy Contract and the Fidelity Index Interest Crediting Method .................1

        B.      Defendant's Breached Promise Concerning the Returns of the Fidelity Index .......2

        C.      Defendant's Misstatements Regarding the Fidelity Index's "Historical Returns"..4

        D.      The Sales Process ....................................................................................................5

        E.      Plaintiff Has Been Harmed .....................................................................................6

II.     THE COMPLAINT STATES A CLAIM FOR BREACH OF CONTRACT ....................6

III.    THE COMPLAINT STATES CLAIMS FOR FRAUD AND INNOCENT
        MISREPRESENTATION……………………………………...………………………..10

IV.     THE COMPLAINT STATES A CLAIM UNDER RICO……...………………………..14

        A.      Common Purpose …….………………………………………………………….15

        B.       Continuing Unit……......………………………………………………………20

V.      CONCLUSION...........................................................................................................21

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Abdelmaguid v. Dimensions Ins. Group,*
No. 361674, 2024 WL 500679 (Mich. App. Feb. 8, 2024)………...……………………………10

*Abels v. Farmers Commodities Corp.,*
259 F.3d 910 (8th Cir. 2001)……………………………………………………………………13

*Atlas Pile Driving Co. v. DiCon Fin. Co.,*
886 F.2d 986 (8th Cir. 1989)……………………………………………………………………15

*Auto-Owners Insurance Co. v. Seils,*
871 N.W.2d 530 (Mich. App. 2015)…………………………………………………………7, 9

*Boyle v. United States,*
556 U.S. 938 (2009)………......……………………………………………………14, 15, 20

*Capitol West Appraisals, LLC v. Countrywide Fin. Corp.,*
759 F. Supp. 2d 1267 (W.D. Wash. 2010)……………………………………………………18

*Chambers v. N. Am. Co. for Life & Health Ins.,*
No. 4:11-CV-00579-JAJ, 2017 WL 11681057 (S.D. Iowa Mar. 31, 2017)…………………18, 21

*Chambers v. N. Am. Co. for Life & Health Ins.,*
No. 411CV00579J, 2012 WL 12824764 (S.D. Iowa June 1, 2012)…………………………18, 21

*Clinton v. Security Benefit Life Ins. Co.,*
63 F.4th 1264 (10th Cir. 2023)……………………………………………………………...11

*Craig Outdoor Advert., Inc. v. Viacom Outdoor, Inc.,*
528 F.3d 1001 (8th Cir. 2008)……………………………………………………………...19

*E-Shops Corp. v. U.S. Bank Nat'l Ass'n,*
678 F.3d 659 (8th Cir. 2012)……………………………………………………………………14

*Grove v. Beer Barn Corp.,*
No. 20-cv-00027, 2021 WL6618708 (S.D. Iowa Apr. 21, 2021)………………………………9

*Gunderson v. ADM Inv. Servs., Inc.,*
No. C96-3148, 2001 WL 624834 (N.D. Iowa Feb. 13, 2001)………………………………...17

*H & Q Props., Inc. v. Doll,*
793 F.3d 852 (8th Cir. 2015)……………………………………………………………………12

*Hanczaryk v. Chapin*,
No. 313278, 2014 WL 5462600 (Mich. App. Oct. 28, 2014)……………………………………7

Handeen v. Lemaire,
112 F.3d 1339 (8th Cir. 1997)………...……………………………………………..14, 15, 16, 17

*In re EpiPen Direct Purchaser Litig.*,
No. 20-CV-0827 (ECT/TNL), 2021 WL 147166 (D. Minn. Jan. 15, 2021)……………………..16

*Kruse by & through Kruse v. Repp*,
543 F. Supp. 3d 654 (S.D. Iowa 2021)……………………………………………………..15

*Kruse v. Repp*,
611 F. Supp. 3d 666 (S.D. Iowa 2020)…………………………………………………17, 20

*Loissa v. Flagstar Bancorp, Inc.*,
895 F.3d 423 (6th Cir. 2018)........................................................................7

*Malek v. AXA Equitable Life Ins. Co.*,
No. 20-CV-04885, 2023 WL 2682408 (E.D.N.Y. Mar. 29, 2023)………………………………19

*Marchek v. United Services Automobile Ass'n*,
118 F.4th 830 (6th Cir. 2024)…………………………………………………………9, 10

*Murr Plumbing, Inc. v. Scherer Bros. Fin. Servs. Co.*,
48 F.3d 1066 (8th Cir.1995)…………………………………………………………..12

*National Organization for Women, Inc. v. Scheidler*,
510 U.S. 249 (1994)……………………………………………………………...15

*Nelson v. Nelson*,
833 F.3d 965 (8th Cir. 2016)……………………………………………………….20

*Nichiow v. Sotorion Corp.*,
No. 352218, 2021 WL 1050355 (Mich. App. March 18, 2021)………………………………7, 9

*Russello v. United States*,
464 U.S. 16 (1983)………………………………………………………………15

*Sedima, S.P.R.L. v. Imrex Co.*,
473 U.S. 479 (1985)…………………………………………………………14, 15

*SSC Assoc. Ltd. Partnership v. Gen. Retirement Sys. of City of Detroit*,
192 Mich. App. 360 (1991)………...……………………………………………………7

*Titan Ins. Co. v. Hyten,*
491 Mich. 547 (2012)…………………………………………………………………………11

*United States v. Clark,*
646 F.2d 1259 (8th Cir. 1981)…………………………………………………………....14

*United States v. Turkette,*
452 U.S. 576 (1981)……………………………………………………………………....14

Plaintiff hereby respectfully submits this Resistance to Defendant's Motion [ECF No. 43] and supporting Memorandum [ECF No. 43-1] ("Mem." or "Memorandum") that seek dismissal of Plaintiff's First Amended Complaint [ECF No. 41] ("FAC").

## I.    RELEVANT BACKGROUND

### A.    The Policy Contract and the Fidelity Index Interest Crediting Method

Defendant sold Plaintiff an Indexed Universal Life insurance policy (the "Policy") with an effective date of January 10, 2024.[1] ¶¶ 11-19.[2] The Policy had an initial face coverage value of over $1.16 million, and Plaintiff agreed to pay substantial scheduled premiums of $18,000 per year to maintain the Policy. ¶ 20; *see* Policy at 4 (planned monthly premium of $1,500).

The Policy includes an "Account Value," which is the life insurance Policy value that is meant to grow large enough through the Policy term to cover the ongoing annual premium and provide the policyholder with the lifetime income benefit for which the Policy was purchased, as well as being available to fund loans or partial withdrawals. ¶ 2; Policy at 30-36. Accordingly, the Accumulated Value and, in turn, the Interest Crediting Strategies, are important and integral components of the overall Policy product and its value to the customer.

Generally speaking, the Account Value increases over time based on net premiums plus the sum of any returns from the "Interest Crediting Method" selected by the policyholder. The Policy's Interest Crediting Method is one of five investment options selected by the policyholder for investment of the Account Value: a Fixed Account and four Index Selections. The four Index

---

[1] A copy of Plaintiff's Policy is attached as Exhibit A [ECF No. 43-5] to Defendant's Request for Judicial Notice [ECF No. 43-3]. All page citations to the Policy are to the page number printed on the bottom middle of each page. For ease of discussion in the present briefing, Plaintiff refers to this specific Policy, but the arguments herein are fully applicable to the Policies of all putative Class Members (as those terms are defined in the FAC).

[2] All references herein to "¶__" or "¶¶__" are to the FAC unless otherwise specified.

Selections are an S & P 500 Index; an S & P 400 Index; a Russell 2000 Index; and the Fidelity Multifactor Yield 5% ER Index Selection at issue in this case (the "Fidelity Index"). ¶¶ 26-41. The Policy clearly states that all four Indices (including the Fidelity Index) do not include dividends paid by the underlying companies in the Indices. Policy at 7-8. The Policy does ***not*** state that there are any deductions or other limitations on payment from the Fidelity Index. Policy at 8. Plaintiff chose to invest 50% of his Account Value in the Fidelity Index. ¶ 99.

### B.    Defendant's Breached Promise Concerning the Returns of the Fidelity Index

The Policy states that the Fidelity Index "offer[s] exposure to companies with attractive valuations, high quality profiles, positive momentum signals, lower volatility and higher dividend yield than the broader market, as well as U.S. Treasuries, which may reduce volatility over time." ¶ 63; Policy at 8. The Policy does not define "exposure;" however, it is "a term used to describe investment risk."[3] Accordingly, the Policy promises that the risk (and commensurate potential reward) of selecting the Fidelity Index crediting method will match the risks and potential reward of investing in the "companies with attractive valuations" (the equity component) and "U.S. Treasuries" (the fixed income component) that underly the Index.[4]

Although the Policy does not use these words, such an index is known in the finance industry as a total return index. A total return index "***tracks*** both the capital gains as well as any

---

[3] https://corporatefinanceinstitute.com/resources/wealth-management/financial-exposure/ (last visited August 7, 2025).

[4] The Fidelity Index is actually comprised of notional assets, meaning that it does not own any stocks, bonds or other assets. ¶ 84. Rather, it simply tracks the returns of designated underlying assets as if the Index owned them. As a result, no one buys an interest in an Index (like someone would in, for example, a mutual fund). Defendant uses the Fidelity Index simply as a measure to adjust the Account Value of the Policy as the Index increases or decreases, and the Index simply provides a strategy for Policy holders to try to increase the Account Values of their Policies.

cash distributions, such as dividends or interest, attributed to the component of the Index."[5] Accordingly, "[a] total return index computes the index value based on capital gains plus cash payments such as dividends and interest."[6] By contrast, "[i]n the world of indices used with insurance products … excess return measures the return of one or more underlying assets **_minus an interest rate_**."[7] In other words, an excess return index does not deliver to the policy holder interest credits equal to the total performance of the underlying asset, but only the total performance **_minus_** a certain amount.

Here, the Policy promised that the Fidelity Index offered straightforward "exposure" to "companies with attractive valuations" and "U.S. Treasuries." However, contrary to Defendant's promise, both the equity and fixed income components of the Fidelity Index **_exclude_** certain returns from the interest credited. ¶ 65. Specifically:

- **Equity**: Credited interest for the equity component is the actual returns **_minus_** financing costs, which are set at the Fed Funds Rate. ¶ 67. On January 10, 2024 (the effective date of the Policy), the Fed Funds Rate was over 5%. ¶ 68. As a result, the equity component of the Fidelity Index had to earn **_over 5%_** just to "break even" and for policyholders who selected the Fidelity Index to receive any interest credit whatsoever. ¶ 68.

- **Fixed Income:** Similarly, credited interest for the fixed income component is the return on U.S. Treasuries **_minus_** the U.S. 10-year Treasury Note rate. ¶ 69. On January 10,

---

[5] https://www.investopedia.com/terms/t/total_return_index.asp (emphasis added) (last visited August 7, 2025).

[6] *Id*.

[7] https://www.spglobal.com/spdji/en/documents/education/education-an-overview-of-return-types-for-insurance-indices.pdf (emphasis added) (last visited August 7, 2025).

2024, the U.S. 10-year Treasury Note rate was over 4%. ¶ 70. Accordingly, the fixed income component had to earn over 4% to "break even" and generate any interest credit for policyholders. ¶ 70.

The Policy thus breached a core promise concerning how the Fidelity Index generated credited interest. Rather than being "expos[ed]" to the loss risks (and potential upsides) inherent in the equity and fixed income components of the Index (as promised in the Policy), Plaintiff and the putative Class were in fact exposed to those risks ***plus an additional 4-5% charge***. *See* ¶ 71. As a result, the Fidelity Index returns were not calculated or credited as promised under the Policy.

### C.    Defendant's Misstatements Regarding the Fidelity Index's "Historical Returns"

As part of the Policy sales process, Defendant provided Plaintiff with an Illustration to demonstrate certain important information about the Index Selection investment options (including the Fidelity Index). ¶ 15; *see also* ¶¶ 13-14.[8] Among other terms, the Illustration lists twenty-years' worth of "historical" crediting rates for the Fidelity Index (and other Index Selections) and emphasizes that the "following chart shows historical detail for each year in the most recent 20-year period." ¶ 75; Illustration at 9-11 of 31. Defendant's chart summarizing these so-called "historical rates" purported to show 5- , 10- and 20-year average crediting rates of between 5.0% and 6.4% for the specific Fidelity Index Crediting Method to which Plaintiff allocated 50% of his Account Value. Illustration at 11 of 31; ¶ 96.

Contrary to Defendant's description, the Fidelity Index has ***not*** existed for twenty years. It began on December 11, 2019, such that at the time Plaintiff entered his contract, only ***four years***

---

[8] A copy of the Illustration is attached as Exhibit B [ECF No. 43-6] to Defendant's Request for Judicial Notice [ECF No. 43-3]. All page citations to the Illustration are to the page number printed on the bottom right of each page ("__ of 31").

of return data could have been based on actual historical information. ¶ 76. Defendants' representations to the contrary were thus false. Rather than providing actual historical data, Defendant relied on a "backcasting" analysis that, from a *post hoc* perspective, cherrypicked what **would have** happened had the index essentially made perfect contemporaneous investment decisions during the backcasted period. *See* ¶¶ 83-93. As Fidelity has acknowledged with regard to the Fidelity Index, "[t]he back-casting simulation assumed that there were no market disruption events and no extraordinary events affecting Index constituents" and that "[a] simulation based on different assumptions may produce different results." ¶ 88. Regulators, insurance industry participants and finance experts have all recognized the potentially misleading nature of back-casted indices. ¶¶ 79-82. These "historical" results are a powerful marketing and sales device. Although Plaintiff understood that **future** results were not guaranteed (Mem. at 4; Illustration at 27 of 31), Plaintiff, like any reasonable consumer, relied on the representation that the Fidelity Index had a proven historical track record, rather than a fictitious backcasted record. ¶¶ 170, 178.

### D.    The Sales Process

As Plaintiff alleges in detail (¶¶ 103-09), Defendant directed every step of the sales process by which Defendant sold the Policy to Plaintiff and the Class. Indeed, Defendant acknowledges the involvement and control it maintains over the Policy sales process. *See* Mem. at 4-7. Defendant created the Policies, Illustrations and marketing guides. ¶ 104. Defendant provided the Sales Channel Persons (as defined at ¶ 10) with those materials and prohibited the Sales Channel Persons from using any alternate Illustrations or marketing materials. ¶ 106. According to Defendant's Agent Advertising Guidelines, any information which references Defendant's insurance products "by name, description, rate or features" must be submitted "for advertising review and approval **PRIOR TO USE**" (emphasis in original). ¶ 106. With regard to Illustrations, Defendant required

that the illustration must be signed and dated by both the agent and the purchaser, and agents must

certify that they have not told the customer anything inconsistent with the Illustration. *See, e.g.,*

Illustration at 27 of 31. Sales Channel Persons receive commission payments from Defendant

based upon how successful they are in selling the Policies under these strict control conditions. ¶

106. The Complaint also details (¶¶ 101-19) the structure of the Enterprise, including the role each

entity plays in the overall Policy sales and delivery process.

Plaintiff bought his Policy through the above processes. He first contacted Defendant's

agent in May 2023. ¶ 11. Over the next several months, he engaged in several rounds of

correspondence and communication with Defendant and its agent including on November 29,

2023; December 4, 2023; December 15, 2023; and January 10, 2024, and including receipt of

several exemplar illustrations and Policy contract documents. ¶¶ 12-14. Plaintiff ultimately

purchased his Policy on or about January 10, 2024. ¶ 15.

### E.      Plaintiff Has Been Harmed

Plaintiff allocated 50% of the Account Value under his policy to the Fidelity Index. ¶ 96.

To date, Plaintiff has paid thousands of dollars to Defendant in Policy premiums. ¶ 97. However,

the Fidelity Index was not a "total return" index as promised in the Policy contract, but an "excess

return" index. Nor did Plaintiff receive an Index with proven historical results as stated in the

Illustration. The excess return Fidelity Index with no proven historical track record that Plaintiff

actually received is not as valuable as the total return index with a historical track record offered

by Defendant in the Policy and Illustration, and Plaintiff has been damaged thereby.

## II.     THE COMPLAINT STATES A CLAIM FOR BREACH OF CONTRACT

The Policy states that the Fidelity Index is "a multi-asset index, offering exposure to [1]

companies with attractive valuations, high quality profiles, positive momentum signals, lower

volatility and higher dividend yield than the broader market, as well as [2] U.S. Treasuries, which may reduce volatility over time." Mem. at 3; Policy at 8; ¶ 41, 63. Because the Index was not as represented and did not perform as promised, Defendant is liable for breach of contract.

Under Michigan law, a plaintiff must plead: "(1) the existence of a contract; (2) a breach of that contract; and (3) damages suffered by the nonbreaching party as a result of the breach." Mem. at 9 (quoting *Loissa v. Flagstar Bancorp, Inc.*, 895 F.3d 423, 428 (6th Cir. 2018). Any ambiguity "in an insurance contract is construed against the insurer." *Auto-Owners Insurance Co. v. Seils*, 871 N.W.2d 530, 539 (Mich. App. 2015). Moreover, if contract language "permits two equally reasonable interpretations," summary disposition is inappropriate under Michigan law, and the question must instead be submitted to a jury. *Nichiow v. Sotorion Corp.*, No. 352218, 2021 WL 1050355, at *4-6 (Mich. App. March 18, 2021) (*citing SSC Assoc. Ltd. Partnership v. Gen. Retirement Sys. of City of Detroit,* 192 Mich. App. 360, 363 (1991)).

The parties agree that the Policy is a contract. *See* Mem. at 2-4; ¶ 148. Moreover, there is no dispute that the Policy contract states that the Fidelity Index is "a multi-asset index, offering exposure to [1] companies with attractive valuations, high quality profiles, positive momentum signals, lower volatility and higher dividend yield than the broader market, as well as [2] U.S. Treasuries, which may reduce volatility over time." Policy at 8. Accordingly, there is no dispute that the relevant language is part of the Policy contract.[9]

Failure to provide what an insurance contract promised is a black-letter breach of contract. *See Hanczaryk v. Chapin¸* No. 313278, 2014 WL 5462600, at *7 (Mich. App. Oct. 28, 2014) (approving jury instruction that "[t]he policy of insurance required certain behavior and performance on the part of the [insurer d]efendants; and, if these [d]efendants failed to fulfill the

---

[9] Defendant's argument concerning integration (Mem. at 9-11) is thus irrelevant.

terms of that contract as claimed, then you may find that the [d]efendants breached the contract"). Plaintiff has also alleged Defendant's breach in detail. Here, contrary to the Policy's promises, the interest paid by that Index was ***not*** based on exposure to "companies with attractive valuations" and "U.S. Treasuries." ¶ 63.

Rather than provide "exposure" to strong companies and U.S. Treasuries as promised (*see* ¶ 41), the Fidelity Index credited interest only in the amount of the actual returns but ***minus 5%*** for equities and ***minus 4%*** for fixed income. ¶¶ 67-70. The investment "exposure" was thus substantially worse than promised because the Fidelity Index had to earn a substantial amount before there could be any positive interest credit. Accordingly, the Index was what was known an "excess return" index. ¶ 65. Plaintiff was in substance promised a total return index, but was given a total return index ***minus*** a 4-5% fee, a far inferior product than what Plaintiff had bargained for. The promise concerning the risk and returns for the Fidelity Index are in sharp contrast to Defendant's express statements regarding all four Indices (including the Fidelity Index) that the dividends paid by the underlying companies were excluded. Policy at 7-8. Defendant plainly understood how to alert policyholders to index deductions when it chose to do so.

Finally, Plaintiff has alleged that he suffered damages as a result of Defendant's breach (¶¶ 96-99), which Defendant does not challenge. *See generally* Memorandum.

Defendant's ***only*** argument with regard to Plaintiff's allegation that Defendant breached the contract ignores the substance of the Policy language. Defendant asserts that "[t]here is no mention of 'total return' funds in the Policy." Mem. at 12.[10] In other words, because the Policy

---

[10] Defendant, in equally summary fashion, seeks dismissal of any breach of contract claim premised on Defendant's false representations concerning the Fidelity Index's historical returns. *See* Mem. at 12-13. Plaintiff addresses those misrepresentations in Part III below in connection with Plaintiff's claims for common law fraud and innocent misrepresentation. However, Plaintiff is not pursuing any breach of contract claim regarding historical returns.

does not use the precise terminology "total return," which is a term of art, Defendant argues that it cannot have breached the contract.[11]

This argument elevates form over substance. It ignores the clear language (and substantive import) of Defendant's Policy description of the Fidelity Index. As discussed above, the Policy promises that the Fidelity Index provides exposure to "companies with attractive valuations" and "U.S. Treasuries." ¶ 41; Policy at 8. That, by definition, is a "total return" index. *See* ¶ 152. Instead, the Fidelity Index was the "total returns" ***minus*** a 4-5% fee, which by definition is an "excess return" index and, critically for this civil action, significantly less valuable. *See* ¶¶ 65-73, 152. That Defendant omitted the precise labels "total return" and "excess return" does not alter the underlying facts or terms of the Policy or make Defendant's breach any less actionable. Defendant cannot promise policyholders exposure to certain potential gains and risks but then expose them to massive additional costs that fundamentally worsen the investment risk.

To the extent this Court believes that the Policy language concerning the Fidelity Index is at all ambiguous, any ambiguity must, as discussed above, be resolved in favor of Plaintiff. *Auto-Owners Insurance Co.* 871 N.W.2d at 539. At a minimum, any such ambiguity is not amenable to resolution on a motion to dismiss (or summary judgment) and must be left to the ultimate fact-finder. *Nichiow*, 2021 WL 1050355 at *4-6. The Sixth Circuit's recent application of Michigan law to reverse the District Court's granting of a motion to dismiss in *Marchek v. United Services*

---

[11] To the extent the Defendant seeks to raise new arguments in its Reply brief, such new arguments would be wholly improper. *See, e.g., Grove v. Beer Barn Corp.*, No. 20-cv-00027, 2021 WL6618708, at *1-2 (S.D. Iowa Apr. 21, 2021) (granting motion to strike new argument raised in reply brief as a matter of "basic fairness"); *see also* LR 7(g) (reply briefs limited to "assert[ing] newly decided authority" or "to respond to new and unanticipated arguments made in the resistance"). Should Defendant nonetheless seek to raise new arguments in reply, Plaintiff requests that, at a minimum, this Court schedule oral argument on Defendant's motion to dismiss.

*Automobile Ass'n*, 118 F.4th 830 (6th Cir. 2024), is instructive. In *Marchek*, the plaintiff purchased a car insurance policy that, *inter alia*, capped payment for car replacement after an accident at "the amount that it would cost, at the time of loss, to buy a comparable vehicle." *Id.* at 832. The plaintiff understood that language to include *all* monies necessary "to buy a comparable vehicle," while the defendant insurer argued that the language excluded taxes and fees. *Id.* at 833-34. The Sixth Circuit reversed the District Court's grant of summary judgment for defendant, concluding that, because the provision, at a minimum, "is equally susceptible to more than a single meaning[,] its interpretation is a question of fact that must be decided by the jury." *Id.* at 834 (cleaned up); *see generally id.* at 835-39. Similarly, at the very least, the Policy is ambiguous as to whether Defendant can deduct 4-5% off the top from Plaintiffs' Index credits.

## III. THE COMPLAINT STATES CLAIMS FOR FRAUD AND INNOCENT MISREPRESENTATION

Under Michigan law, Defendant's misrepresentations concerning the excess nature of the Fidelity Index constitute fraud (if made knowingly) or innocent misrepresentation (if not). ¶¶ 163-71 (Third Claim sounding in fraud), 172-81 (Fourth Claim sounding in innocent misrepresentation).[12] As discussed in Part I.B. above, Defendant falsely represented in the Policy

---

[12] In order to plead fraud, a plaintiff must plead that (1) the defendant made a material representation, (2) the representation was false, (3) the defendant knew that it was false when it was made, or made it recklessly, without any knowledge of its truth and as a positive assertion, (4) the defendant made the representation with the intention that the plaintiff would act on it, (5) the plaintiff acted in reliance on it, and (6) the plaintiff suffered injury because of that reliance. *Abdelmaguid v. Dimensions Ins. Group*, No. 361674, 2024 WL 500679, at *5 (Mich. App. Feb. 8, 2024). Similarly, in order to plead innocent misrepresentation, a plaintiff must plead that "(1) the defendant made a material representation, (2) the representation was false, (3) the defendant made it with the intention of inducing reliance by the plaintiff, (4) the plaintiff acted in reliance on the representation, and (5) the plaintiff thereby suffered an injury that benefited the defendant." *Id.* Plaintiff pleads each of these elements at ¶¶ 163-71 (fraud) and ¶¶ 172-81 (innocent misrepresentation) respectively.

that the Fidelity Index was in substance a total return rather than an excess return index, and Plaintiff reasonably relied on that representation to his detriment (¶¶ 170, 178).[13]

Defendant also engaged in fraud or innocent misrepresentation when it misrepresented in the Illustration that the Fidelity Index had twenty years of historical returns. ¶ 75; Illustration at 9-11 of 31; *see* Part I.C. above. As discussed above, the Fidelity Index only launched on December 11, 2019, meaning it only existed for just over four years at the time Plaintiff purchased his policy. ¶¶ 19, 76. Accordingly, all of the purported "historical returns" before December 2019 were back-casted fiction, premised on unrealistic assumptions. ¶¶ 83-93. These "historical returns" were a powerful marketing tool, and Plaintiff reasonably relied on these misrepresented "historical" results. ¶¶ 170, 178.

Notably, the Tenth Circuit reversed a District Court's dismissal of similar state-law fraud (and RICO) claims against a different insurer who also misrepresented the "excess return" nature of an index and the fact that the "historical returns" were in fact backcasted. *See Clinton v. Security Benefit Life Ins. Co.* 63 F.4th 1264 (10th Cir. 2023). The *Clinton* court concluded that plaintiffs stated a claim where they alleged that "excess-return deductions were undisclosed deductions from the index returns" and that the "hypothetical illustrations were based on backcasted data that misled investors and induced the purchase of the annuity products." *Id.* at 1284, 1286. This case is no different.

Indeed, Defendant does not dispute in its motion to dismiss that Plaintiff has generally pled the elements of each of these claims. *See generally* Mem. at 20. Rather, as to both counts, Defendant makes only an abbreviated argument that Plaintiff has failed to satisfy Fed. R. Civ. P.

---

[13] A fraud plaintiff has no duty under Michigan law to independently investigate or corroborate a defendant's misrepresentations. *Titan Ins. Co. v. Hyten*, 491 Mich. 547, 555 n.4 (2012).

9(b) by ostensibly failing to adequately plead the "who, what, where and how" of the alleged fraud or misrepresentation. *See generally* Mem. at 20.

Defendant is wrong. Rule 9(b) requires that "[i]n alleging fraud ... a party must state with particularity the circumstances constituting fraud." "The '[c]ircumstances' of the fraud include 'such matters as the time, place and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby.'" *H & Q Props., Inc. v. Doll*, 793 F.3d 852, 856 (8th Cir. 2015) (quoting *Murr Plumbing, Inc. v. Scherer Bros. Fin. Servs. Co.*, 48 F.3d 1066, 1069 (8th Cir.1995)).

The Complaint easily satisfies this requirement. For example, the complaint: (1) alleged all key dates for when Plaintiff met with the Defendant's agents, ¶¶ 11-16; (2) specified the documents that were provided to Plaintiff, ¶¶ 17-60; (3) explained why the statements in those documents were false and misleading, ¶¶ 61-99; (4) alleged that Defendant drafted those documents, ¶ 62; and, (5) alleged what was obtained in reliance on the false and misleading statements ¶ 97 ("Plaintiff has paid thousands of dollars to Defendant in Policy premiums"). Specifically:

- **Who**: Defendant made the misrepresentations about both the investment risk and the "historical returns" of the Fidelity Index in the Policy and Illustration documents that Defendant prepared, and controlled. *See generally* Part I above.

- **What**: Defendant misrepresented both the investment risk of the Fidelity Index (*see* Part I.B. above) and the "historical returns" of the Index (*see* Part I.C. above).

- **Where:** Defendant made its misrepresentations in the Policy and Illustration documents that Defendant prepared and controlled.

- **How (and When):** Defendant or its authorized agent[14] sent the documents containing the misrepresentations about both the "historical returns" and the investment risk of the Fidelity Index by electronic and/or U.S. Mail to Plaintiff on several occasions in 2023 into 2024. *See* Part I.D. above.

These detailed allegations put Defendant on notice of the claim. *See, e.g., Abels v. Farmers Commodities Corp.*, 259 F.3d 910 (8th Cir. 2001). In *Abels*, the district court dismissed the claims where the plaintiff sought to hold a principal liable for its agent's fraud. The Eighth Circuit reversed and observed that Rule 9(b) must be interpreted "in harmony with the principles of notice pleading." *Id.* at 920 (citations omitted). In other words, "[t]he special nature of fraud does not necessitate anything other than notice of the claim; it simply necessitates a higher degree of notice, enabling the defendant to respond specifically, at an early stage of the case, to potentially damaging allegations of immoral and criminal conduct." *Id.* The court also found it relevant that the missing detail are facts that "are known to the defendants, but the plaintiffs have not yet had a chance to find them out." *Id.* at 921.

Plaintiff has pled the alleged misrepresentations with great particularity. Indeed, notwithstanding Defendant's *pro forma* argument under Fed. R. Civ. P. 9(b), Defendant does not argue that it somehow does not actually understand the fraud or misrepresentation being alleged.

---

[14] Although the name of Defendant's agent who sold the Policy to Plaintiff is not alleged in the Complaint, Defendant is well aware (from the very documents that Defendant submitted to the Court) that the agent's name is Matthew Koch. *See, e.g.,* [ECF No. 43-5] at 74; [ECF No. 43-6] at 1, 27 of 31. Accordingly, Defendant's argument that Plaintiff has failed to allege the Sales Channel Persons known to him is a red herring. As to the Sales Channel Persons not presently known (and not presently reasonably knowable) to Plaintiff, Defendant is likely aware of who these third parties are and how easily discovery will identify them.

Nor could it. This Court should reject Defendant's attempt to inject uncertainty where none exists.[15]

## IV.    THE COMPLAINT STATES A CLAIM UNDER RICO

A plaintiff who brings suit under 18 U.S.C. § 1962(c) must prove that the defendant engaged in (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Handeen v. Lemaire*, 112 F.3d 1339, 1347 (8th Cir. 1997) (citing *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)).

"The statute does not specifically define the outer boundaries of the 'enterprise' concept but states that the term 'includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.'" *Boyle v. United States*, 556 U.S. 938, 944 (2009) (quoting § 1961(4)); *see also United States v. Clark*, 646 F.2d 1259, 1263 (8th Cir. 1981) ("Under the broadest dictionary definition, 'enterprise' could refer to any undertaking or 'systematic purposeful activity.'"). "This enumeration of included enterprises is obviously broad, encompassing '*any* . . . group of individuals associated in fact.'" *Id*. (quoting § 1961(4); emphasis in original). "The term 'any' ensures that the definition has a wide reach, and ***the very concept of an association in fact is expansive***." *Id*. (citation omitted; emphasis added).[16] "In addition, the RICO statute provides that its terms are to be 'liberally

---

[15] Defendant's citation to *E-Shops Corp. v. U.S. Bank Nat'l Ass'n*, 678 F.3d 659 (8th Cir. 2012), is wholly irrelevant because Plaintiff does not bring an aiding and abetting claim here. Indeed, the Sale Channel Persons are not defendants here.

[16] *See also United States v. Turkette*, 452 U.S. 576, 593 (1981) ("The language of the statute . . . — the most reliable evidence of its intent—reveals that Congress opted for a far broader definition of the word 'enterprise,' and we are unconvinced by anything in the legislative history that this definition should be given less than its full effect.").

construed to effectuate its remedial purposes.'" *Id*. (quoting § 904(a), 84 Stat. 947, note following 18 U.S.C. § 1961).[17]

There are "three characteristics possessed by all RICO enterprises: (1) a common or shared purpose; (2) some continuity of structure and personnel; and (3) an ascertainable structure distinct from that inherent in a pattern of racketeering." *Handeen*, 112 F.3d at 1351 (citing *Atlas Pile Driving Co. v. DiCon Fin. Co*., 886 F.2d 986, 995 (8th Cir. 1989)). "At its core, 'an association-in-fact enterprise is simply a continuing unit that functions with a common purpose.'" *Id*. (quoting *Boyle*, 556 U.S. at 948). Here, the Complaint plausibly alleges an association-in-fact Enterprise comprising Defendant and the Sales Channel Persons. ¶ 102.

A.     **Common Purpose**

The Complaint plausibly alleges that the Enterprise is an ongoing and continuing organization of entities associated for the common or shared purpose of selling the fraudulent Policies. ¶ 103. "[T]he enterprise *itself*, broadly speaking, must be marked by a common purpose, but it is not necessary that every single person who associates with the entity gain some discrete advantage as a result of that particular motivation." *Handeen*, 112 F.3d at 1351 (emphasis in original). "[I]t is sufficient if a RICO defendant shared in the *general* purpose and to some extent facilitated its commission." *Id*. (italics in original).

---

[17] *See also, e.g.*, *National Organization for Women, Inc. v. Scheidler*, 510 U.S. 249, 257 (1994) ("RICO broadly defines 'enterprise' "); *Sedima, S.P.R.L. v. Imrex Co*., 473 U.S. 479, 497 (1985) ("RICO is to be read broadly"); *Russello v. United States*, 464 U.S. 16, 21 (1983) (noting "the pattern of the RICO statute in utilizing terms and concepts of breadth"). *See, e.g.*, *Kruse by & through Kruse v. Repp*, 543 F. Supp. 3d 654, 680 (S.D. Iowa 2021) ("An association-in-fact enterprise is a 'broad' category with an 'expansive' reach, consisting of 'a group of persons associated together for a common purpose of engaging in a course of conduct,' and is 'proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit,'" quoting *Boyle*, 556 U.S. at 944–45).

Defendant suggests that the members of the Enterprise had divergent goals (Mem. at 15-17), but they are wrong. In *In re EpiPen Direct Purchaser Litig*., No. 20-CV-0827 (ECT/TNL), 2021 WL 147166 (D. Minn. Jan. 15, 2021), plaintiffs brought claims against Mylan related to the pricing of EpiPens and alleged that defendant violated RICO by conducting the affairs of enterprises. The plaintiffs alleged that the enterprises "ha[d] the common purposes of 'perpetuating the use of inflated EpiPen list prices' and 'selling, promoting and recommending for purchase, and administering prescriptions for EpiPens, and deriving secret profits from these activities.'" *Id*. at *9. Like Defendant here, the *EpiPen* defendants argued that there is no "common purpose" "because Mylan and each of the PBMs were simply pursuing their own 'divergent goals.'" The plaintiffs responded that the complaint plausibly alleged that each member of the purported enterprises "**stood to benefit**" from the scheme. *Id*. (emphasis added). The court agreed with the plaintiffs and observed that while "[i]t is true that 'divergent goals among members of a purported association-in-fact enterprise' are a 'fatal problem' for a RICO claim," "the Complaint contains a fairly clear description of why [defendant] and the [enterprise members] ***all had interests in keeping EpiPen prices inflated***." *Id*. (emphasis added). The same reasoning applies here. It is a reasonable inference that the interests of each member of the Enterprise were in alignment as they all benefited from the sale of the inflated, fraudulent Policies.  Even if the Enterprise members could also have had other interests in operating their business, that fact does not defeat the plausible allegation that they were aligned with the "general purpose" of selling the fraudulent policies and "to some extent facilitated its commission." *Handeen*, 112 F.3d at 1351.

The Eighth Circuit holding in *Handeen* is instructive. In *Handeen*, the plaintiff was a judgment creditor who alleged the defendants, including a law firm that helped the debtor file for bankruptcy, attempted to use the bankruptcy system to obtain a discharge of the debtor's judgment

debts, including the debt owed to the plaintiff. 112 F.3d at 1343-44. The law firm argued the common purpose "prerequisite [was] unmet because the attorneys did not stand to benefit economically from the enterprise." *Id*. at 1351. The Eight Circuit found this contention "specious" and held that "it is not necessary that every single person who associates with the entity gain some discrete advantage as a result of that particular motivation" and that "it is sufficient if a RICO defendant shared in the general purpose and to some extent facilitated its commission." *Id*. The Court concluded it was "manifest that the common or shared purpose of a bankruptcy estate is to collect assets and pay off creditors" and that "we easily decide that the common purpose element is present here." Like in *Handeen*, the common purpose is easily satisfied here where the common purpose was to sell fraudulently inflated policies.

Similarly, in *Gunderson v. ADM Inv. Servs., Inc*., No. C96-3148, 2001 WL 624834, at *3 (N.D. Iowa Feb. 13, 2001), the plaintiffs were grain producers who alleged defendants violated RICO. The plaintiffs alleged an association-in-fact enterprise comprising a trading advisor, introducing brokers, and grain elevators. The court held that the complaint plausibly alleged a common purpose: "Clearly, the Producers have identified as an enterprise the association-in-fact . . . to market [futures contract] accounts and related consulting agreements and commodity accounts." *Id*. at *15. The court concluded "that the members of the association-in-fact shared the common purpose of marketing HTA agreements to the Producers and to some extent carried it out." *Id*. at *16. So too here. The members of the Enterprise in this action had the common purpose to sell fraudulent policies. *See also Kruse v. Repp*, 611 F. Supp. 3d 666, 701 (S.D. Iowa 2020) ("common purpose, is easily satisfied" by allegations that "members of the Weller Law Enterprise shared the venture or undertaking of shielding Weller's assets . . . to delay, frustrate, or obstruct Kruse's collection of her $2.5 million personal injury judgment.").

Defendant relies heavily on *Chambers v. N. Am. Co. for Life & Health Ins*., No. 4:11-CV-00579-JAJ, 2017 WL 11681057 (S.D. Iowa Mar. 31, 2017) (*see, e.g.,* Mem. at 15-17), but they fail to mention (1) that this was a ruling on those defendants' summary judgment motion based on ***evidence*** and (2) that the same court denied the earlier motion to dismiss based on allegations that are very similar to those raise here. *See* 2012 WL 12824764 (S.D. Iowa June 1, 2012) (denying motion to dismiss). Specifically, the *Chambers* court granted summary judgment because it found there was "insufficient ***evidence*** for a fact finder to conclude that the shared purpose of Defendant and Agents is 'expanding exploitive sales of NA annuities to maximize their mutual profits'" and "to conclude that the purpose of the alleged enterprise was to solely sell Defendant's products." *Id*. at *6 (emphasis added). The court concluded there was "no ***evidence*** that Agents and Defendant shared any common motivation beyond that of their own pecuniary gain" which was "not enough to establish a common purpose." *Id*. (emphasis added). Here, based on the plausible allegation of a common purpose to sell fraudulently inflated policies, the Plaintiffs are entitled to engage in the discovery that the *Chambers* court permitted to develop that evidence.  For that reason alone, the Court should deny the motion.

Defendant also cites *Capitol West Appraisals, LLC v. Countrywide Fin. Corp*., 759 F. Supp. 2d 1267, 1277 (W.D. Wash. 2010) (Mem. at 16), where the court agreed the allegations did not allege a plausible common purpose, because the allegations did not explain "why the brokers have any incentive to place loans with Countrywide" as opposed to any of its competitors. But here, it is a plausible inference that brokers and agents would be incentivized to sell Midland Policies because Midland's policies and illustrations misleadingly used false back-casted data that inflated consumer expectations. *See* ¶¶ 79-93. Midland used a chart in the illustration that brokers and agents provided to potential customers that purported to show historical data from 2003 through

2022 (¶ 51), but "these returns were not historical for the simple reason that the Fidelity Index did not exist prior to December 11, 2019" (¶ 76). Although the false illustrations represented the index had a historical "average" return of 6.4%, in reality, *the Fidelity Index was down 1.03% over its history*. ¶ 93. Defendant concedes: "Independent brokers and agents . . . have an interest in increasing sales of life insurance products (and receiving commissions) generally," Memo. at 17, and brokers and agents could have been incentivized to sell Midland's products because Midland's materials grossly inflated the performance of the indexes, which could increase sales and commissions. *See also* ¶ 106 ("The Sales Channel Persons receive commission payments from Defendant based upon how successful they are in selling the Policies based on Defendant's fraudulent materials.").

Defendant also relies on *Malek v. AXA Equitable Life Ins. Co.*, No. 20-CV-04885, 2023 WL 2682408, at *15 (E.D.N.Y. Mar. 29, 2023) (Mem. at 16), but that case is inapt because the *Malek* court highlighted how the complaint failed to contain any factual allegations regarding "control" or "any communications Equitable had with any Broker Defendant" or "any particular incentives Equitable provided to any Broker Defendant" or "any concrete information at all regarding the nature of Equitable's relationship with any Broker Defendant," or "particular incentives provided by Equitable." *Id.* at *15. This Complaint here plausibly alleges both control (¶ 108) and incentives (¶ 106).

*Craig Outdoor Advert., Inc. v. Viacom Outdoor, Inc.*, 528 F.3d 1001 (8th Cir. 2008) (Mem. at 15), is inapplicable here because the plaintiff alleged that enterprise members had inconsistent, "divergent goals" alleging that "Viacom operated these RICO enterprises with a goal of eliminating competition in its billboard markets" but "this goal would appear to be Viacom's alone, since competition for billboard sites on railroad property would presumably be in the railroads'

best interests." *Id.* at 1027. In sharp contrast, selling the fraudulently inflated Policies was a shared goal of all of the members of the Enterprise, and their interests were aligned.

### B.    Continuing Unit

"[A]n association-in-fact enterprise is simply a continuing unit that functions with a common purpose." *Boyle*, 556 U.S. at 948. "While the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence." *Id.* "The ultimate inquiry is 'whether the enterprise encompasses more than what is necessary to commit the predicate RICO offense'" and accordingly, a complaint must allege an enterprise that "would still exist were the predicate acts removed from the equation." *Kruse v. Repp*, 611 F. Supp. 3d 666, 699 (S.D. Iowa 2020) (citations omitted).

Here, the Complaint plausibly alleges the enterprise that is a continuing unit which would continue to exist if the predicate acts were removed from the equation. Indeed, with respect to the index used to credit the account value, the Complaint alleges there were four options, but the illegal conduct at issue only involved the fraudulent representations associated with one of those options, the Fidelity Index. See ¶¶ 3, 38, 40. Accordingly, the unit could continue to operate even when not engaged in the common, general purpose of marketing the fraudulent Fidelity Index.

The facts of *Nelson v. Nelson*, 833 F.3d 965, 968 (8th Cir. 2016) (Mem. at 18), are quite different from those here. In *Nelson*, the alleged enterprise comprised plaintiff's brother, their partnership, their banker, their accountant, the accounting firm including its entire corporate group, plaintiff's nephews, and "an ill-defined cluster of other business entities [plaintiff's brother] allegedly used  to facilitate taking money out of [the partnership]." *Id.* at 968. The court found that the alleged enterprise was not a continuing unit because "allegations show different subsets of the

group pursuing their own ends separately—operating farming businesses, for example, or providing financial services for hire." *Id*. But the Enterprise here is not "ill defined," but rather includes the Defendant and the entities involved in the sales channel process of marketing and selling the fraudulent policies, including independent marketing organizations, broker general agencies, and independent agents.

Defendant again relies heavily on *Chambers* (Mem. at 19), but as explained above, that opinion concerned a summary judgement motion, after *discovery*, based on evidence. *See Chambers*, 2017 WL 11681057, at *5 ("A party can show the existence of an association-in-fact through '***evidence*** of an ongoing organization, formal or informal, and by ***evidence*** that the various associates function as a continuing unit.'" (emphasis added)). On the earlier motion to dismiss, the *Chambers* court found that the complaint adequately pleaded a RICO claim. *See Chambers v. N. Am. Co. for Life & Health Ins*., No. 411CV00579J, 2012 WL 12824764 (S.D. Iowa June 1, 2012). This Court should reach the same conclusion as the Chambers court did when denying the motion to dismiss.

## V.    CONCLUSION

For all of the reasons set forth above, Plaintiff respectfully requests that Defendant's Motion to Dismiss be DENIED in full.


Dated: August 8, 2025                      Respectfully submitted,

                                           /s/ Seth R. Klein
                                           Robert A. Izard (*pro hac vice*)
                                           Craig A. Raabe (*pro hac vice*)
                                           Seth R. Klein (*pro hac vice*)
                                           IZARD, KINDALL & RAABE LLP
                                           29 South Main Street, Suite 305
                                           West Hartford, CT  06107
                                           Tel: (860) 493-6292

Fax: (860) 493-6290
rizard@ikrlaw.com
craabe@ikrlaw.com
sklein@ikrlaw.com

Joseph Gentile (*pro hac vice*)
Ronen Sarraf (*pro hac vice*)
SARRAF GENTILE LLP
10 Bond Street #212
Great Neck, NY 11021
Tel: (516) 699-8890
Fax: (516) 699-8968
joseph@sarrafgentile.com
ronen@sarrafgentile.com

Michael C. Kuehner AT0010974
Michael Kuehner Law, PLC
4300 Grand Avenue
Des Moines, Iowa 50312
Tel: (641) 425-4764
Fax: (515) 505-3434
michael@kuehnerlawfirm.com

ATTORNEYS FOR PLAINTIFF JACK R.
BADER

## <u>CERTIFICATE OF SERVICE</u>

I, Seth R. Klein, hereby certify that a true copy of the foregoing document filed through the ECF system will be electronically sent to the registered participants as identified on the Notice of Electronic Filing on August 8, 2025.

<u>*/s/ Seth R. Klein*</u>
Seth R. Klein