IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| JACK R. BADER, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>MIDLAND NATIONAL LIFE INSURANCE COMPANY,<br><br>Defendant. | 4:25-cv-00020-SHL-SBJ<br><br><br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS** |

## I. INTRODUCTION.

Plaintiff Jack R. Bader brings putative class action claims against Defendant Midland National Life Insurance Company ("Midland") based on Midland's alleged sale of life insurance policies under false and misleading pretenses. For reasons explained below, Bader has not stated a viable breach of contract claim because he has not identified a contract provision that Midland violated. He also has not stated viable claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO") because his allegations, even when accepted as true, are insufficient to establish that Midland and the other entities and individuals who allegedly participate in the fraudulent scheme are part of a RICO "enterprise." Bader has, however, stated viable claims for common law fraud and innocent misrepresentation. Accordingly, the Court GRANTS IN PART and DENIES IN PART Midland's Motion to Dismiss. (ECF 43.) The dismissal of the breach of contract and RICO claims is WITHOUT PREJUDICE.

## II. BACKGROUND.[1]

### A. *Bader's Policy.*

Bader's claims arise out of his purchase of an Indexed Universal Life Insurance Policy (the "Policy") from Midland. (ECF 41, ¶ 1.) Bader's goal in buying the Policy, which he communicated to Midland's agent, was to save money for retirement. (Id., ¶ 12.) The agent steered Bader away from a 401k or Individual Retirement Account and into the Policy. (Id.) The Policy ostensibly was designed to help Bader achieve his retirement goal by including an "Equity Component," the value

---

[1] In ruling on a Motion to Dismiss, the Court accepts all facts in the complaint as true and construes them in the light most favorable to Plaintiffs. *See Eckert v. Titan Tire Corp.*, 514 F.3d 801, 806 (8th Cir. 2008).

of which is based on the performance of a market-based index, and a "Fixed Income Component," the value of which is based on investments in U.S. Treasuries. (Id., ¶¶ 3, 31–34, 64.) In other words, the Policy included potential returns based on the performance of market-based assets.

Midland provides policyholders like Bader a small menu of options for the index for the Equity Component of the Policy. (Id., ¶ 3.) From this menu, Bader chose the Fidelity Multifactor Yield 5% ER Value ("Fidelity Index"). (Id., ¶ 3.) Policyholders like Bader do not actually invest in the Fidelity Index or any other asset. (Id., ¶¶ 3, 32, 39.) Instead, the value of the Equity Component of the Policy is based on "notional assets"; meaning, in essence, a hypothetical investment in the chosen asset. (Id., ¶39.) The Policy Includes a "Schedule of Policy Benefits" that summarizes each of the options for the Equity Component. (ECF 43-5, pp. 7–9.)[2]  This includes the following description for the Fidelity Index:

> The Fidelity Multifactor Yield Index$^{sm}$ 5% ER (the "Index") is a multi-asset index, offering exposure to companies with attractive valuations, high quality profiles, positive momentum signals, lower volatility and higher dividend yield than the broader market, as well as U.S. treasuries, which may reduce volatility over time.… Fidelity Product Services LLC ("FPS") has licensed this index for use for certain purposes to Midland National Life Insurance Company (the "Company") on behalf of the Product.

(Id., p. 9.)

Bader essentially alleges, based on this Policy language, that Midland promised to increase the Equity Component of his Policy by the same rate as any increase in the Fidelity Index. (ECF 41, ¶ 152.) In other words, in Bader's view, the Policy promised that the Fidelity Index would be a "total return index," although he acknowledges that the Policy does not use those words. (ECF 46, p. 7.) A few months after buying his Policy, Bader received a Fidelity Investments Brochure explaining that the Policy treated the Fidelity Index as an "excess returns index." (ECF 41, ¶¶ 64–65.) This means that the value of the Equity Component of the Policy only increases if the Fidelity Index outperforms a benchmark (here, the Fed Funds Rate). (Id., ¶ 67.) Even then, Bader's Policy value only goes up by the amount of such increase. (Id., ¶ 67.) Thus, for example, when Bader's Policy was issued on January 10, 2024, the Fidelity Index needed to earn over 5% just to "break even" based on the then-existing Fed Funds Rate. (Id., ¶ 68.)

---

[2] All citations to page numbers on the Electronic Case Filing ("ECF") system are to the numbers auto-populated by the ECF system in the upper right hand corner of each page. These numbers are often different than those placed by the parties on the bottom of each page.

Similarly, the Fixed Income Component of the Policy value also was based on excess returns, rather than total returns. (Id., ¶ 69.) The Fixed Income Component would increase only if the return exceeded the U.S. 10-year Treasury Note rate, and only by the amount of such increase. (Id.) On January 10, 2024, the U.S. 10-year Treasure Note rate was over 4%, and thus the Fixed Income Component needed to exceed that rate just to "break even." (Id., ¶ 70.) Bader characterizes the break-even rates in the Equity and Fixed Income Components as "effectively a massive undisclosed 'fee.'" (Id., ¶ 71.) He alleges that the true, "excess returns" nature of the Equity Component and Fixed Income Component was identified in the Fidelity Investments Brochure dated May 24, 2024, that was not provided to him during the sales process. (Id., ¶ 64.)

  B. *Bader's Breach of Contract Claim.*

In his First Amended Complaint, Bader alleges that Midland breached the Policy by measuring value on an excess returns basis, instead of total returns. (Id., ¶ 152.) He also alleges that Midland "promise[d]" that the Fidelity Index had twenty years of historical returns, when in fact it had not even existed for twenty years. (Id., ¶ 153.) Next, he alleges that Midland provided misleading data with respect to the Fidelity Index regarding floor rates and participation rates, "resulting in a further reduction in the returns credited under the Fidelity Index." (Id., ¶ 154.) Finally, he alleges that Midland "provided a misleading volatility control description for the Fidelity Index in its Illustration." (Id., ¶ 155.) He later withdrew some of these breach of contract theories, as discussed in the Legal Analysis section, below.

  C. *Bader's RICO Claims.*

Count 2 of the First Amended Complaint arises under RICO. Bader alleges that Midland is part of a RICO "Enterprise," along with "Sales Channel Persons" consisting of independent marketing organizations who market the policies, broker general agencies who provide back-office support for the policies, and independent agents who sell policies to consumers like Bader. (Id., ¶¶ 10, 102.) Midland allegedly directs the Enterprise by creating the policies and related illustrations and disclosure materials, requiring the use of those materials by the Sales Channel Persons, and collecting proceeds of the Enterprise. (Id., ¶ 104.) Midland closely regulates the sale of policies, including through the use of uniform marketing materials and the imposition of training and certification requirements on agents. (Id., ¶ 106.) Midland also provides commissions to agents based on sales. (Id., ¶¶ 106–07.) Bader acknowledges that the members of the Enterprise "engage

in legitimate business operations separate and apart from their activities on behalf of Enterprise," including marketing and selling other insurance products. (Id., ¶ 117.)

Bader alleges that "[t]he Enterprise functions, in part, by deceiving consumers nationwide concerning the nature and operation of the indices incorporated into the Policies sold through and on behalf of the Enterprise." (Id., ¶ 120.) He alleges that the predicate acts for the Enterprise include wire fraud and mail fraud related to the false and misleading policies, illustrations, marketing materials, and related materials, as well as the collection of premiums from purchasers and payments of commissions to agents and others. (Id., ¶¶ 124–25, 127–28.)

### D. Bader's Other Claims.

Bader's remaining claims are for Common Law Fraud (Count 3) and Common Law Innocent Misrepresentation (Count 4), both of which arise out of the same allegedly false and misleading conduct relating to the sale and performance of the policies. He brings all four claims both individually and on behalf of a class of similarly situated persons. (Id., ¶ 138.)

## III. LEGAL STANDARDS.

### A. Motion to Dismiss.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Rydholm v. Equifax Info. Servs. LLC*, 44 F.4th 1105, 1108 (8th Cir. 2022) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "The plausibility standard requires a plaintiff to show at the pleading stage that success on the merits is more than a 'sheer possibility.'" *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678). In determining plausibility, the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Richter v. Advance Auto Parts, Inc.*, 686 F.3d 847, 850 (8th Cir. 2012) (per curiam). The Court is not obligated to accept legal conclusions, however, and "[a] pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *United States ex rel. Ambrosecchia v. Paddock Lab'ys, LLC*, 855 F.3d 949, 955 (8th Cir. 2017) (quoting *Iqbal*, 556 U.S. at 678).

"Though 'matters outside the pleadings' may not be considered in deciding a Rule 12 motion to dismiss, documents necessarily embraced by the complaint are not matters outside the pleading." *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017) (quoting *Enervations, Inc. v. Minn. Min. & Mfg. Co.*, 380 F.3d 1066, 1069 (8th Cir. 2004)). "In general, materials

embraced by the complaint include 'documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleadings.'" *Id.* (quoting *Ashanti v. City of Golden Valley*, 666 F.3d 1148, 1151 (8th Cir. 2012)).

A heightened pleading standard applies to fraud allegations. Fed. R. Civ. P. 9(b). A party alleging fraud "must state with particularity the circumstances constituting fraud." *Id.* "This particularity requirement demands a higher degree of notice than that required for other claims . . . ." *United States ex rel. Benaissa v. Trinity Health*, 963 F.3d 733, 739 (8th Cir. 2020) (quoting *United States ex rel. Costner v. URS Consultants, Inc.*, 317 F.3d 883, 888 (8th Cir. 2003)). To satisfy it, "the complaint must plead such facts as the time, place, and content of the defendant's false representations, as well as the details of the defendant's fraudulent acts, including when the acts occurred, who engaged in them, and what was obtained as a result." *Id.* (quoting *United States ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 556 (8th Cir. 2006)). Even though this requirement is meant to be "context specific and flexible," it cannot be satisfied by conclusory and generalized allegations. *United States ex rel. Strubbe v. Crawford Cnty. Mem'l Hosp.*, 915 F.3d 1158, 1163 (8th Cir. 2019) (quoting *United States ex rel. Thayer v. Planned Parenthood of the Heartland*, 765 F.3d 914, 918 (8th Cir. 2014)).

    *B. Racketeer Influenced and Corrupt Organizations Act.*

18 U.S.C. § 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." The statute "does not cover all instances of wrongdoing. Rather, it is a unique cause of action that is concerned with eradicating organized, long-term, habitual criminal activity." *Crest Const. II, Inc. v. Doe*, 660 F.3d 346, 353 (8th Cir. 2011) (quoting *Gamboa v. Velez*, 457 F.3d 703, 705 (7th Cir. 2006)). To plead a viable RICO claim, Bader must plausibly allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Nitro Distrib., Inc. v. Alticor, Inc.*, 565 F.3d 417, 428 (8th Cir. 2009) (quoting *Sedima S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)). When the alleged predicate acts involve mail and/or wire fraud, the pleading must "state with particularity the circumstances constituting a fraud or mistake." *Id.* (quoting Fed. R. Civ. P. 9(b)).

5

## IV. LEGAL ANALYSIS.

*A. The First Amended Complaint Fails to State a Viable Claim for Breach of Contract.*

Midland argues, first, that Bader has not stated a viable breach of contract claim. Under Michigan law,[3] Bader must plausibly allege: "(1) the existence of a contract; (2) a breach of that contract; and (3) damages suffered by the nonbreaching party as a result of the breach." *Lossia v. Flagstar Bancorp, Inc.*, 895 F.3d 423, 428 (6th Cir. 2018). Midland argues that Bader has not identified any provision of the Policy that has been breached. Bader, by contrast, argues that Midland promised the value of his Policy would be measured on the basis of total returns, not excess returns.

As a threshold matter, Bader conceded in his Resistance to Defendant's Motion to Dismiss and at oral argument that statements in the Policy illustrations cannot serve as part of his breach of contract claim. (ECF 46, p. 13 n.10; ECF 52, p. 30.) Bader alleged otherwise in his First Amended Complaint, which asserted that his breach of contract claim included, among other things, statements in the illustrations regarding the Fidelity Index having twenty years of historical returns, the use of floor and participation rates, and the volatility control description. (ECF 41, ¶¶ 75–76, 153–55.) Bader presumably now recognizes that these statements, even if false, cannot support his breach of contract claim because: (a) the Policy contains an integration clause stating that it is the "entire contract" between the parties (ECF 43-5, p. 23); and (b) the illustration includes Bader's signed acknowledgement stating, "I further understand that this illustration is not part of the contract and it does not predict actual performance." (ECF 43-6, p. 28). Accordingly, the Court will treat the Policy itself as the only contract between the parties. (As discussed below, Bader continues to rely on the illustrations in connection with his RICO and misrepresentation claims.)

With the illustrations off the table, Bader's breach of contract claim revolves entirely around the statement in the Schedule of Policy Benefits (which the parties agree is part of the Policy) that the Fidelity Index "is a multi-asset index, offering exposure to companies with attractive valuations, high quality profiles, positive momentum signals, lower volatility and higher dividend yield than the broader market, as well as U.S. treasuries, which may reduce volatility over time." (ECF 43-5, p. 9.) Bader argues that Midland breached the Policy by promising

---

[3] The parties appear to agree that Michigan law is governing on state law claims given that Bader is a Michigan citizen and bought his Policy in Michigan. (ECF 43-1, p. 15; ECF 46, pp. 12, 15.) The outcome of Midland's Motion to Dismiss would not change even if the Court applied Iowa law.

"exposure" to strong companies and U.S. treasuries but then measuring the Equity Component of the Policy's value on an excess-returns basis. (ECF 46, p. 13.) Midland, by contrast, points out that no provision of the Policy promises that valuation will be based on a total return basis.

Bader has not stated a viable claim for breach of contract. The word "exposure" does not mean or imply that growth in value will be measured in any specific way, such as on a total return or excess return basis. Instead, it is a broad term that means "the condition of being subject to some effect or influence" or "the condition of being at risk of financial loss." *See Exposure*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/exposure (last visited November 10, 2025). Here, by using the Fidelity Index as a benchmark for the Equity Component of Bader's Policy, Midland is giving him "exposure" to companies in the Fidelity Index because the value of his Policy is "subject to some effect or influence" from the performance of those companies. It does not matter that the upside of that "exposure" is more limited than he would prefer. *See, e.g.*, *Soltis v. J.C. Penney Corp.*, 635 F. App'x 245, 248 (6th Cir. 2015) (holding that when a contract uses "expansive language," it is "irrelevant" that greater specificity is not provided).

Bader argues in the alternative that "exposure" is ambiguous and could be interpreted to prohibit Midland from making "deduct[ions]" when using the growth in the Fidelity Index to determine the growth in his Equity Component and/or Fixed Income Component. (ECF 46, p. 15.) This argument, too, is unavailing. The word "exposure" is not ambiguous simply because it is broad and open-ended. *See, e.g.*, *PNC Bank, Nat'l Ass'n v. Goyette Mech. Co., Inc.*, 140 F. Supp. 3d 623, 637 (E.D. Mich. 2015) ("[T]he breadth of the indemnity does not render it ambiguous."). To the contrary, in context, the breadth of the word "exposure" appears to be the point: Midland was not promising to use any particular methodology determine how the "exposure" to "companies with attractive valuations" would impact the value of Bader's Policy. *See Pontiac Sch. Dist. v. Pontiac Educ. Ass'n*, 811 N.W.2d 64, 69 (Mich. App. 2012) ("[T]he term 'instruction' is not ambiguous, but rather is broad in definition because it applies to 'knowledge or information imparted' without placing qualifications or restrictions on the type of knowledge or information imparted."). The outcome might change if Bader could point to some *other* Policy language in which Midland promised to use a specific methodology. Having failed to do so, his breach of contract claim fails as a matter of law. Accordingly, the Court will grant Midland's Motion to Dismiss the breach of contract claim. The Court will do so, however, without prejudice because it

cannot conclude that it would be futile for Bader to amend his pleading in any attempt to state a viable breach of contract claim.

      B.  *The First Amended Complaint Fails to State a Viable RICO Claim.*

      The failure of Bader's breach of contract claim does not mean that his remaining claims automatically fail, too. The Court instead must evaluate those claims independently, starting with Bader's RICO claim. Midland argues that Bader has failed to plead a plausible RICO "enterprise" and allege predicate acts of racketeering with the level of particularity required under Fed. R. Civ. P. 9(b). The Court agrees that Bader has not alleged sufficient facts to plausibly allege the existence of an enterprise and therefore will dismiss the RICO claim.

      RICO defines "enterprise" to mean "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Here, Bader defines the Enterprise to include Midland and "Sales Channel Persons," which consist of independent marketing organizations, broker general agencies, and independent agents. Bader does not allege that Midland and the Sales Channel Persons have formed their own formal entity or organization; instead, he alleges an association-in-fact enterprise. To plead such an enterprise, he must plausibly allege "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009).

      1.  <u>The Fact that Independent Insurance Agents Are Part of the Alleged Enterprise Does Not Per Se Mean the Enterprise Does Not Have a Common Purpose.</u>

      Midland argues that there is no "common purpose" here because the Sales Channel Persons consist of independent entities and agents who market and sell other insurance policies beyond those provided by Midland. *See Chambers v. N. Am. Co. for Life & Health Ins.*, No. 4:11-CV-00579, 2017 WL 11681057, at *6 (S.D. Iowa Mar. 31, 2017). To the extent Midland is arguing that independent sales agents by definition cannot be part of a RICO enterprise with an insurer, the Court disagrees. The Eighth Circuit has recognized that entities or individuals can be independent of one another in some ways and yet still share a "common purpose." *See, e.g.*, *Handeen v. Lemaire*, 112 F.3d 1339, 1351 (8th Cir. 1997) (holding that outside law firm could be part of RICO enterprise despite not fully sharing financial incentives with other alleged members); *see also In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 375 (3d Cir. 2010) (recognizing that insurers and independent brokers may, in some circumstances, form a RICO enterprise). Accordingly, the Court cannot broadly conclude at the pleading stage that Bader has failed to state

a viable RICO claim simply because he acknowledges that members of the alleged enterprise have business interests outside of the fraudulent scheme.

> 2. Bader Has Not Alleged Sufficient Facts Regarding the Sales Channel Persons to Establish That They Share a Common Fraudulent Purpose with Midland.

Although the Court disagrees with the sweeping proposition that an independent sales agent per se cannot be part of a RICO enterprise with an insurer, Midland also argues more narrowly that Bader has not alleged sufficient facts to establish a common purpose between Midland and the Sales Channel Persons here. The Court agrees.

As a starting point, many courts have held that members of an alleged enterprise must share a "common *fraudulent* purpose" when the racketeering acts consist of mail and wire fraud. *See First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 174 (2d Cir. 2004) ("[F]or an association of individuals to constitute an enterprise, the individuals must share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes." (quoting *First Nationwide Bank v. Gelt Funding Corp.*, 820 F. Supp. 89, 98 (S.D.N.Y. 1993))); *see also, e.g. Robins v. Glob. Fitness Holdings, LLC*, 838 F. Supp. 2d 631, 653 (N.D. Ohio 2012) (dismissing RICO claims where plaintiff did "not allege that the payment processors shared a common fraudulent purpose to sufficiently allege an association-in-fact enterprise."). In other words, a RICO enterprise does not exist simply because one bad actor employs unwitting third parties to perpetuate a fraudulent scheme. *See, e.g.*, *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 400 (7th Cir. 2009) (affirming dismissal of RICO claim where alleged enterprise consisted of insurance company and nonprofit organization with whom it had a "garden-variety marketing arrangement"); *Moss v. BMO Harris Bank, N.A.*, 258 F. Supp. 3d 289, 300 (E.D.N.Y. 2017) (holding that a RICO enterprise does not exist simply because a defendant "use[s] an otherwise legitimate network to advance its own, illegitimate business interests"); *Jubelirer v. MasterCard Int'l, Inc.*, 68 F. Supp. 2d 1049, 1053 (W.D. Wis. 1999) (holding that credit card companies are not part of RICO enterprise by allowing payments to be made to illegal on-line casinos).

The Eighth Circuit has not expressly decided whether a plaintiff must allege a "common fraudulent purpose" to state a viable claim. *See Craig Outdoor Advert., Inc. v. Viacom Outdoor, Inc.*, 528 F.3d 1001, 1026 (8th Cir. 2008). Nonetheless, this Court concludes that the Eighth Circuit would so hold if squarely presented with the question given the authorities identified above, including, especially, the cases from the Second and Seventh Circuits. *See First Cap. Asset Mgmt., Inc.*, 385 F.3d at 174; *Crichton*, 576 F.3d at 400. Indeed, the Eighth Circuit has repeatedly

recognized that there are limits on what can constitute an enterprise. For example, in *Nelson v. Nelson*, 833 F.3d 965, 969 (8th Cir. 2016), the Eighth Circuit affirmed the dismissal of a RICO claim where the plaintiff merely alleged that third parties "follow[ed] [a co-defendant's] directions" and "perform[ed] various discrete tasks within their fields of expertise, as they were hired to do." *Nelson* held that the involvement of third parties in an "overarching scheme . . . does not automatically turn their disjointed activities into a group effort." *Id.* Similarly, the Eighth Circuit has held that RICO does not "penalize all who are employed by or associated with a RICO enterprise, but only those who, by virtue of their association or employment, play a part in directing the enterprise's affairs." *Handeen*, 112 F.3d at 1348 (discussing *Reves v. Ernst & Young*, 507 U.S. 170 (1993)). Finally, but more broadly, the Eighth Circuit has "rejected attempts to convert ordinary civil disputes into RICO cases." *Craig Outdoor Advert., Inc.*, 528 F.3d at 1029. Requiring a plaintiff to plead a "common fraudulent purpose" fits well in line with these cases because otherwise a RICO enterprise would exist whenever a single defendant uses services from third parties to achieve a fraudulent goal. "This is not what RICO penalizes." *Crichton*, 576 F.3d at 400; *see also Jubelirer*, 68 F. Supp. 2d at 1053 (describing it as "absurd" to read RICO so broadly).

Here, Bader is noticeably circumspect in what he alleges about the involvement of the Sales Channel Persons in the alleged enterprise. He repeatedly and consistently insists that Midland (and Midland alone) had control over the creation and dissemination of policies, sales materials, and disclosure materials. (E.g., ECF 41, ¶¶ 104–08.) He alleges, for example that Midland: "direct[s]" the Enterprise (id., ¶ 104); "requires that the Sales Channel Persons strictly comply with the fraudulent scheme concerning the sale of Policies" (id.); "require[s] the use of uniform misleading marketing materials, Illustrations, Disclosure Materials and Policies" (id., ¶ 106); "prohibits the Sales Channel Persons from using any other marketing materials, Illustrations, and Policies" (id.); requires agents to "certify in writing that they have not told the customer anything inconsistent with the misleading Illustration or with the fraudulent scheme" (id.); and "exercises substantial control over the direction of the Enterprise" (id., ¶ 108). Moreover, Bader provides no reason why the Sales Channel Persons would have treated their relationship with Midland any differently than their relationship with any other insurance company whose products they sold. He does not allege, for example, that Midland paid greater commissions than other insurance companies or otherwise took steps to encourage the Sales Channel Persons to steer customers into Midland's products instead of those offered by competitors. Indeed, he stops short of ever expressly alleging that the

10

agents or other Sales Channel Persons even *knew* that Midland's materials contained false statements, nor does he allege that they otherwise played any part in controlling or directing the affairs of the alleged Enterprise. Instead, as alleged, they serve entirely as conduits for Midland.

More is required to state a viable RICO claim. In *Crichton*, the Seventh Circuit affirmed the dismissal of a RICO claim in a situation where an insurer allegedly used a third party to help market allegedly fraudulent policies. 576 F.3d at 399–400. *Crichton* concluded that the plaintiff's complaint did "no more than describe the ordinary operation of a garden-variety marketing arrangement" in which the third-party was "merely a conduit for the sale of [the insurer's] insurance." *Id.* at 400. The same deficiencies exist in Bader's pleading. *See id.* (affirming dismissal); *see also Fitzgerald v. Chrysler Corp.*, 116 F.3d 225, 228 (7th Cir. 1997) (holding that RICO claim failed as a matter of law where plaintiff merely alleged that defendant-manufacturer "deal[t] with its dealers in other agents in the ordinary way, so that their role in the manufacturer's illegal acts is entirely incidental").

Lower courts have dismissed RICO claims in similar circumstances. In *Malek v. AXA Equitable Life Ins. Co.*, 20-CV-04885, 2023 WL 2682408, at *15–16 (E.D.N.Y. Mar. 29, 2023), the court dismissed RICO claims because, *inter alia*, the pleading did "not include any non-conclusory factual allegations that any Broker Defendant was aware of Equitable's purported scheme or that any Broker Defendant used the sales materials at issue in order to advance a common purpose with Equitable (as opposed, for example, advancing an individual self-interest)." Similarly, in *Robins*, 838 F. Supp. 2d at 653, the court dismissed a RICO claim because third parties who unwittingly provided ordinary services to help advance a fraudulent scheme could not be considered members of a RICO enterprise. *See also Moss*, 258 F. Supp. 3d at 300 (dismissing RICO claims for lack of common purpose where plaintiff merely alleged that defendant "used an otherwise legitimate network to advance its own, illegitimate business interests").

The logic of these cases applies with full force here and compels the Court to conclude that Bader's allegations, even when accepted as true, fail to establish that Midland and the Sales Channel Persons are part of a RICO enterprise. *See Target Corp. v. LCH Pavement Consultants, LLC*, No. CIV. 12-1912, 2013 WL 2470148, at *4 (D. Minn. June 7, 2013) ("[RICO] requires more than parallel conduct; it requires relationships among those associated with the enterprise, and it requires those associated with the enterprise to 'function as a unit, that they be "put together to form a whole."'" (quoting *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 374 and *Boyle*, 556

11

U.S. at 945)). At most, Bader has merely alleged that the Sales Channel Persons are a conduit for "a fraud perpetuated by [Midland], not an association-in-fact enterprise directed and controlled by [Midland]. That is, [Bader's] claim 'begins and ends' with the fraud allegedly committed by [Midland]." *Crichton*, 576 F.3d at 400 (quoting *Richmond v. Nationwide Cassel L.P.*, 52 F.3d 640, 647 (7th Cir. 1995)). The Court therefore will grant Midland's Motion to Dismiss the RICO claim. The dismissal will, however, be without prejudice, as the Court cannot conclude that it would be futile for Bader to try to amend his pleading to address the deficiencies identified above.

### C. The First Amended Complaint States Viable Claims for Common Law Fraud and Innocent Misrepresentation.

When it moved to dismiss, Midland's final argument was that Bader failed to plead his common law fraud and innocent misrepresentation claims with the level of particularity required by Fed. R. Civ. P. 9(b). (ECF 43-1, p. 26.) Midland's Reply states, however, that it is "satisfied" with Bader's response to the Motion to Dismiss on those claims insofar as Bader "now limits those claims to two theories: (i) that Midland misrepresented whether the Fidelity index is a total or excess return index and (ii) that Midland misrepresented the historical returns of the index." (ECF 48, p. 14.) To that end, at oral argument, Midland's counsel acknowledged that Midland was no longer moving to dismiss the fraud and innocent misrepresentation claims other than with respect to the two theories that Midland interprets Bader as having "abandoned." (ECF 52, p. 25.) While the Court does not necessarily agree that Bader has "abandoned" other fraud theories, it nonetheless understands that Midland is no longer asking for wholesale dismissal of the fraud and innocent misrepresentation claims. Accordingly—and because the Court would have concluded that Bader identified the allegedly fraudulent statements with sufficient particularity anyway—the Court will deny Midland's Motion to Dismiss with respect to the fraud and innocent misrepresentation claims.

### V. CONCLUSION

The First Amended Complaint states viable claims for common law fraud and innocent misrepresentation but not for breach of contract or under RICO. Thus, the Court GRANTS IN PART and DENIES IN PART Midland's Motion to Dismiss. (ECF 43.) The breach of contract and RICO claims are DISMISSED WITHOUT PREJUDICE. The common law fraud and innocent misrepresentation claims will proceed. To the extent the parties have not already done so, they are directed to comply with Fed. R. Civ. P. 26(f) and all other Local and Federal Rules relating to the preparation and filing of a proposed scheduling order and discovery plan.

IT IS SO ORDERED.

Dated: November 12, 2025

STEPHEN H. LOCHER
U.S. DISTRICT JUDGE